HECKMAN AND SHELL, a Partnership, Plaintiff and Appellant, v. FREDERICK WILSON, Defendant.

No. 11926.
Submitted June 16, 1971.
Argued August 11, 1971.
487 P.2d 1141.

Morrow, Nash & Sedivy, Bozeman, Edmund P. Sedivy argued, Bozeman, William J. Dee, Grangeville, Idaho, for plaintiff and appellant.

Berg, O'Connell, Angel & Andriolo, Bozeman, Ben E. Berg, Jr. argued, Bozeman, for respondent.

MR. JUSTICE DALY delivered the Opinion of the Court.

This is an action by plaintiff Heckman and Shell, a partnership, against Frederick Wilson, defendant, arising out of a

cattle raising venture agreement. The cause was tried by the district court of Gallatin County, the Hon. Jack D. Shanstrom presiding, without a jury. From a judgment in favor of defendant the plaintiff appeals.

Don Heckman, Vern Heckman, and Clarence P. Shell comprise a partnership, plaintiff herein, that manages cattle ranches in Idaho, Nevada and Montana. Defendant Frederick Wilson is a Spokane realtor who has periodically invested in cattle raising operations.

The partnership leased the Flying D Ranch consisting of approximately 120,000 acres in Gallatin and Madison Counties, Montana, for a term extending from 1958 to 1968, to pasture and raise cattle. During the term of the lease Clarence Shell who had been in the cattle business most of his life, managed the Flying D Ranch. After December 1963, two herds of cattle were pastured on the Flying D Ranch, one belonging to the partnership, the other belonging to Frederick Wilson. This venture is the subject of this action.

In 1963 Wilson arranged to purchase a herd of cattle located in a feed lot in Three Forks, Montana. The sale was contingent upon Wilson locating lands upon which to pasture the cattle. At noon on December 4, 1963, Wilson and one Zucker, who assisted Wilson in purchasing the herd, arrived at the Flying D Ranch and spent the remainder of the day with Shell viewing the ranch and discussing a pasture agreement. Later that afternoon Shell drove Wilson and Zucker to the Gallatin County airport. Shortly before departing Wilson and Shell executed an agreement prepared by Wilson's attorney. Several minor changes were made in the agreement, in pencil, by the parties. This agreement reads as follows:

"Dec. 4th, 1963

"This is an agreement between Heckman Brothers and C. P. Shell, 1st party of Flying "D" Ranch, Bozeman, Montana and Frederick Wilson, 2nd party.

"This is a cattle raising venture. 2nd party will furnish and

own all the cattle. 1st party shall have full control and responsibility for the care and feeding of the cattle and all additions thereto in accordance with the best husbandry methods. At the beginning of the winter period which starts November 1st each year, 1st party agrees to have on hand not less than one ton of hay for each animal to be wintered. The cost of the hay and feeding thereof shall be on the obligation of 1st party. As compensation for so caring for and managing the cattle, 1st party will receive one-half of the calf crop.

"2nd parties half of the calf crop shall be made up of heifers which he will incorporate with his cattle for the purpose of building the herd. If there are not enough heifer calves to make up half the calf crop, then 2nd party shall receive the balance of his share in steer calves. [or vice-versa, F.W., C.P.S.]

"2nd party agrees to pay $75 per head per year for winter feeding his share of the calves for the first year after weaning and 1st party agrees to take care of them from then on.

"2nd party is to supply the bulls for this venture and 1st party to care for them. 1st party to care for all dehorning, vaccinating and necessary work to be done on all the cattle.

"All cattle and calves shall carry 2nd parties brand. Calves will be branded before they are two months old. 1st party shall not be held responsible for death losses which are not his fault. In case of an animals death, 1st party agrees to produce the hide with brand on it to 2nd party. 1st party will however be accountable to 2nd party for the fair market value at weaning time each year for all unaccounted for cattle. The value of the unaccounted for cattle shall be deducted from 1st parties share of the calf crop.

"A roundup and cattle count will be made in the spring and in the fall each year in the presence of 2nd party or his appointed agent. Split of the calf crop will be made on or about November 1st of each year.

"It is further agreed that at the expiration of this agree-

ment 1st party shall have an option to buy any of the cattle herd at the then market price.

"If at any time, in 2nd parties opinion, he feels his cattle are not receiving proper care, he may remove them from 1st parties possession and terminate this agreement. [If three independent stockmen agree. F.W., C.P.S.]

"It is understood and agreed that this agreement is for a term of *Five* (5) years from *Nov. 1st 1963* which coincides with 1st parties lease on the Flying "D" Ranch. If 1st party renews or extends its lease on said ranch, then 2nd party may at his option renew or extend this agreement for a similar term.

> Heckman & Shell
> By C. P. Shell
> Frederick Wilson"

[Pencil changes]

The parties operated pursuant to the agreement during 1964, starting with a base herd of 224 head. Wilson received 93 heifers as his share and paid $25 per head for winter feeding. Financial problems arose thereafter and several adjustments as to feed costs and the number of cattle to be pastured were agreed upon by the parties.

During the winter of 1965, a portion of Wilson's calves was fed at the Three Forks feed lot. Wilson offered $25 per head for the cost of that feeding as provided in his contract, but was refused and the partnership threatened to impose an "agister's lien" for the feed lot cost and under such circumstances Wilson paid the feed lot price.

In the summer of 1966, the partnership was advised by their accountant that the arrangement with Wilson was not producing a profit and was sustaining a loss under the current payment schedule. This was due in part to the large number of bulls, dry cows and young heifers which resulted in a lower calf production. The partnership offered to buy Wilson's cattle but he declined. In February 1967, the partnership

members, their attorney and accountant met with Wilson in Grangeville, Idaho. Tentative agreement was reached relating to contract changes in regard to Wilson paying additional money for the feeding of the bulls, dry cows and young heifers and calves. The partnership also wanted the clause requiring proof of death by production of branded hides struck from the existing contract.

Upon his return to Spokane Wilson had his attorney prepare a memorandum of proposed changes in the contract, but did not include any change in the proof of death clause. This document was forwarded on February 20, 1967 by Wilson's attorney to the partnership attorney, with instructions that it be executed by all of the parties.

The evidence is in dispute between Shell and Wilson as it concerns the details of the transaction thereafter, but it was established that the document remained in Shell's possession and was never signed by the partnership. Shell claims it was taken on April 28th from Shell's wife, without his consent. Wilson testified he met Shell in the Belgrade Lounge on the 27th or 28th of April, 1967 and that Shell was drinking and no business was transacted; the following morning they met for breakfast; Shell gave Wilson his vehicle and instructed him to go to his home and get the unsigned document. The reason for not signing being the partnership wanted the proposed changes in the contract to include removal of the death loss clause.

The cattle remained on the Flying D until the fall of 1968, when the contract terminated. The partnership billed Wilson for feeding nonproductive animals, but Wilson refused payment. Wilson also claimed loss for missing bulls, etc. Wilson's cattle were sold and the partnership threatened an "agister's lien" if $70,000 was not placed in escrow pending the settlement of accounts. This was done and the present suit brought in the district court for an equitable accounting. The partnership's complaint alleged as follows:

Count I sought reformation of the agreement for fraud or mistake. Count II sought rescission of the agreement, but this count was dismissed as the agreement terminated before trial. Count III sought a dissolution of the *agreement as a joint venture* and requested an accounting. Counts IV, V, and VI alleged breach of the agreement for failure to make required payments for pasturing of the cattle, and sought damages in the sum of $60,269.80.

Defendant brought two counterclaims based upon the cattle raising agreement: Count I alleged a failure to account for all cattle and bulls, and sought damages of $23,865. Count II alleged a failure to properly care for the cattle, and sought damages in the sum of $51,480.

The court, sitting without a jury, entered findings of fact and the following conclusions of law:

"I. That there is no evidence that through the mutual mistake of the parties or fraud by the defendant that the written contract of December 4, 1963, did not express the full and true agreement of the parties.

"II. That the written agreement of December 4, 1963, is an agistment contract governed by the law and rules of bailment and the relation of the parties to each other under the contract is as bailee and bailor and not as partners or joint venturers.

"III. That except for the actual costs of winter feeding of defendant's calves at the Three Forks Feed Lot in the winters of 1965 and 1966, the evidence is not sufficient to show that the written agreement dated December 4, 1963, was altered or modified by the parties.

"IV. That the defendant have and recover from the plaintiffs the sum of Thirty Six Hundred Dollars ($3600.00) as the reasonable value of six Charlois Bulls.

"V. That the First National Bank in Bozeman be and it hereby is directed to refund to the defendant the sum of $70,000.00 and accrued interest held in escrow.

"VI. That plaintiffs take nothing by virtue of their com-

plaint and that the defendant recover from the plaintiff his costs herein incurred."

The partnership appeals from the final judgment and presents the following issues on appeal:

1. The trial court erred in failing to find that Heckman and Shell, a partnership, and Frederick Wilson agreed to operate as a joint venture, and are, therefore, bound to equitably account to each other.

2. The trial court erred in failing to find that the written agreement dated December 4, 1963, was modified by subsequent oral agreements and that Wilson must respond to the partnership for his failure to perform thereunder.

3. The trial court erred in failing to find that the written agreement between Wilson and the partnership dated December 4, 1963, was modified by a subsequent written agreement whereby Wilson must respond to Heckman and Shell for his failure to perform thereunder.

4. The trial court erred in failing to find that the agreement between Frederick Wilson and Heckman and Shell, a partnership, dated December 4, 1963, should be revised because of the fraud or mutual mistake of the parties or the mistake of Heckman and Shell, which Wilson knew or suspected.

5. The trial court judgment as a result was in error.

Issue No. 1. Was the contract a joint venture and are the parties bound to equitably account to each other?

The appellant partnership attempts to harmonize the contract here being considered with the guidelines this Court applied to joint ventures in Rae v. Cameron, 112 Mont. 159, 168, 114 P.2d 1060.

In *Rae* the Court first declares it to be a matter of *intent* between the parties which is *"determined in accordance with the ordinary rules governing the interpretation and construction of contracts."* (Emphasis added.) The Court further said:

"A contract is also necessary as between the parties. It need not, however, 'be expressed or be embodied in a formal agree-

ment, or particularly specify or define the rights and duties of the parties * * *' ".

And further, the relationship " 'may be inferred from the conduct of the parties * * *.' "

■ Appellant partnership attempts to use both guidelines to construe the written contract which is contradictory on its face. In the process they attempt to use parol evidence by Shell concerning a conversation had, when the contract was executed at the airport on December 4, 1963. This conversation concerned an agreement to modify at a future date, as experience would dictate, so that it would be mutually profitable. Following the appellant's argument this would, if so interpreted, modify the terms of the written contract and form a profit sharing joint enterprise. There is no merit in this argument.

Appellant has no basis for converting the plain terms of this agistment contract into a profit sharing or loss bearing joint venture. The rule of statute, followed mandatorily throughout the body of contract law, is that the written contract supersedes all prior negotiations and precludes evidence that alters, contradicts, or amends its written terms. Section 13-607, R.C.M. 1947. In Davison v. Casebolt, 154 Mont. 125, 130, 461 P.2d 2, 5, this Court said:

"This Court has frequently held that written contracts supersede all oral negotiations. See Riddell v. Peck-Williamson Heating & Ventilating Co., 27 Mont. 44, 69 P. 241."

■ The only available theories accorded the appellant to reform this contract would lie in one of the exceptions to the parol evidence rule, under either mistake or fraud. However, before equity will intervene to correct an alleged mistake in a written instrument, the evidence of the mistake must be clear, convincing and satisfactory. Humble v. St. John, 72 Mont. 519, 234 P. 475.

■ This standard has not been met by appellant partnership the members of which are experienced men in an area

of endeavor in which they have had a lifetime association. Any statement made by Wilson to the effect that his belief that the agreement would be "mutually profitable" is devoid of misrepresentation of any nature before the law. In point is Barron v. Koenig, 80 Idaho 28, 324 P.2d 388, 394:

"A representation which is an honest expression of opinion, based upon reasonable ground, and which is expressed and understood as nothing more than an opinion, cannot be made the basis of actionable fraud. [Citing cases] Misrepresentations as to future income and profits are usually held to be non-actionable expressions of opinion. 37 C.J.S. Fraud § 54, p. 320."

There being no sustainable issue of fraud or mistake between the parties, the contract must be given full force and effect without regard to prior oral testimony attempting to vary the terms.

The *Rae* case specifically requires " 'a joint proprietary interest and a right of mutual control' ". The contract places this interest in Wilson, in clear terms and there is no merit in appellant's argument on this point. In fact the conduct of the partnership throughout the operation of the agreement consistently evidences this understanding. Shell billed Wilson for transportation and veterinary costs for the herd. Additionally, twice appellant asserted an agister's lien against respondent's herd, during the term of the contract. The initial assertion of the lien was stated in appellant's letter of October 13, 1966 to Wilson:

"Providing such payment is made, we withdraw our claim of an agister's lien against your cattle in our possession."

Again during the sale of the herd, the disbursal agreement offered in exchange for an escrow deposit contained the covenant:

"WHEREAS, the said parties of the first part *claim an agister's lien against all animals, pastured, fed and cared for by the first parties,* under any and all agreements between

the parties to include said dry cows for alleged due and unpaid claims *for the care and feeding of said cattle,* which claim or claims is disputed by the party of the second part.

\* \* \*

"Upon the deposit of the proceeds of the sale as above set forth, the party of the first part agrees to waive any and all possessory liens against all *cattle belonging to the party of the second part.*" (Emphasis added.)

█ The legal explanation of the contractual relationship between the partnership and Wilson is an agistment agreement which follows the theory of bailment. 3 C.J.S. Animals § 16, p. 1107. The term agistment is characterized by an agreement in which one person agrees to care for and feed animals of another for a consideration, either at a named price or for the reasonable value of the services rendered. 3 C.J.S. Animals § 15, p. 1107; 4 Am.Jur.2d, Animals 72, p. 320. Statutory authority and explanation of an agister's lien is found in section 45-1106, R.C.M.1947. Noel v. Cowan, 80 Mont. 258, 260 P. 116; Engle v. Pfister, 127 Mont. 65, 257 P.2d 561.

Issue No. 2. Was the written agreement of December 4, 1963, modified by subsequent oral agreements?

In regard to this issue, appellant has alleged two additional modifications of the written agreement. The first oral modification was the oral agreement by the parties in December 1964, whereby the open heifers would require payments by Wilson of $25 per animal for winter feed and ten cents per day per animal for summer pasture. Respondent offered to make a partial payment of $2,803.58 on this obligation, but refused to make full payment of $7,051.

The second modification of the original written agreement occurred at Grangeville, Idaho on February 1, 1967, at which time the parties agreed to adjust certain payments for feeding of dry cows, bulls, yearling heifers, and for the winter feeding of the respondent's share of the calves. It is alleged the

only performance lacking here has been respondent's failure to pay.

■ As we discussed under Issue No. 1, prior oral or contemporaneous statements will not be introduced in evidence to vary the terms of an express contract clear on its face and evidencing the accurate intention of the parties.

Issue No. 3. Was the written agreement of December 4, 1963, modified by a subsequent written agreement?

■ At the Grangeville, Idaho meeting on February 1, 1967, proposed modifications to increase the compensation from Wilson to the partnership were discussed and also a request was made by the partnership that the contract provision requiring them to furnish branded hides for dead animals be deleted. On February 20, 1967, a letter and proposed modifications was sent to the partnership attorney by Wilson's attorney with instructions that the modifications be signed by all parties. The modifications were never signed and the record discloses it was the refusal of Wilson to delete the clause requiring the furnishing of branded hides for dead animals by the partnership that prevented the execution.

This nonaction of appellant represents a failure to accept an offer for written modification and thus no subsequent contention of adherence to it is valid. Section 13-907, R.C.M. 1947. In Ikovich v. Silver Bow Motor Co., 117 Mont. 268, 276, 157 P.2d 785, 789, this Court said:

" 'The general rule is that parties to a written agreement coming within the provisions of the statute may not, by mere oral agreement, alter one or more of the terms thereof, and thus make a new contract, resting partly in writing and partly in parol, at least if the modification is of a material term of the contract, and, as hereinafter indicated, has not been executed. The contract can be modified only in the manner in which the contract could be legally made enforceable in the first instance.' 37 C.J.S. Frauds, Statute of § 232, pp. 731, 732. "

Of equal significance to the failure of acceptance is the failure of an adequate consideration to support the proposed modification. Although the attention of this Court is not addressed to the consideration of the proposed modification which was not accepted, the general rule regarding the requirement of consideration for modification of a contract is clearly stated in 17 Am.Jur.2d, Contracts § 462, p. 929.

The written amendment simply proposed that the appellant continue to feed respondent's cattle for the remainder of the contract term at an increase in the price. This is nothing more than a promise to perform a previous, contractual obligation. Additionally, appellant would have Wilson give up his contract right as it concerned the hides of dead animals. Thus, any proposed consideration flows from the wrong party.

As stated by this Court in Kovacich v. Metals Bank & Trust Co., 139 Mont. 449, 451, 365 P.2d 639, 640:

"As students of the law we are all aware of the consideration requirement in a contract. The rule is well-established that a promise to do what a person is already obligated by law or contract to do is not sufficient consideration for a promise made in return. Hewitt v. Novak, 117 Mont. 365, 158 P.2d 627; Williston, Contracts (3d ed.), § 130, page 531."

Issue No. 4. Should the written agreement of December 4, 1963, be revised because of fraud or mistake?

Here, again, the partnership complains that Wilson had superior knowledge of the cattle business and the fact that there were no provisions for feeding dry cows, bulls, yearlings, open heifers, and additions to the herd, was a fraudulent act on his part. The record does not sustain this argument. All parties seemed to be well acquainted with the cattle raising and feeding business. Shell had been doing this all his adult life. Further, the record reveals that Wilson was agreeable, without further consideration, to make adjustments after the Grangeville, Idaho conference, but the partnership refused.

In Hein v. Fox, 126 Mont. 514, 520, 254 P.2d 1076, 1079, we said:

"Courts can give no solace where parties to a contract find themselves minus expected profit through failure to exercise care in drawing up such contract."

From the evidence before the trial court and this Court, there was no evidence of fraud nor mistake beyond anything other than business judgment. Legal theories c a n n o t be strained or aborted in order to extract men from their contractual commitments when they do not perform to their expectations. Upper Missouri G & T Elec. Coop. v. McCone Elect. Coop., 157 Mont. 239, 484 P.2d 741; Curry v. Hoven, 157 Mont. 501, 487 P.2d 295.

Issue No. 5. This issue concerns the alleged error of the trial court's judgment and in view of our holdings on the other four issues, need not be discussed.

Judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, HASWELL and CASTLES concur.