**John KUPKA and National Aero Sales Corporation, Appellants,**

v.

**E. L. MOREY, Appellee.**

**No. 2149.**

Supreme Court of Alaska.

Oct. 22, 1975.

Kenneth P. Jacobus, of Hughes, Thorsness, Lowe, Gantz & Powell, Anchorage, for appellants.

H. Bixler Whiting, of Whiting & Associates, Fairbanks, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and BURKE, JJ.

## OPINION

BOOCHEVER, Justice.

■ This case arises out of the allegedly wrongful repossession of an airplane and basically involves problems pertaining to contract construction. The parties to this appeal take diametrically opposing positions on all issues, agreeing only that this is a simple case. Unfortunately, we cannot similarly characterize the multiple issues which have been presented.[1]

We shall first summarize the facts which are germane to the resolution of this appeal. John Kupka is the president of two Nevada corporations dealing in the purchase, lease and sale of aircraft. National Aero Sales Corporation is engaged principally in the buying and selling of airplanes, while Nasco Leasing Company primarily leases aircraft. Kupka and his wife are the sole owners of National Aero Sales, while his children own the stock of Nasco Leasing.

On August 8, 1971, Joseph Felder, doing business as Felder's Air Taxi in Barrow, Alaska, leased an Aero Commander from National Aero Sales. E. L. Morey, a Barrow businessman, signed as guarantor of the lease.[2] The lease was for a term of six months and specified that the value of the aircraft was $22,000.00 with monthly rentals required of $1,000 plus $7.00 per flight hour. Morey made an initial payment of $3,500.00 on this lease on behalf of Felder, and four additional payments totaling $2,100.00 were made by Felder. Within less than a month after the airplane was received by Felder, it crashed at Barrow. While the airplane was being repaired, Mr. Felder fell in arrears in making his month-

---

1. Many of the issues are scantily briefed. Although we have examined all issues, our resolution of this appeal makes it unnecessary to discuss a number of them including right of a guarantor to sue, statute of frauds, recordation of airplane titles under 49 U.S.C.A. § 1403 and the piercing of corporate veils. In addition, we hold that the novation issue raised by the appellant was not properly pleaded as an affirmative defense in accord-

ance with Alaska R.Civ.P. 8(c) and thus must be considered waived pursuant to Alaska R.Civ.P. 12(h). *See Rollins v. Leibold,* 512 P.2d 937 (Alaska 1973).

2. There is a dispute as to whether there was a purchase option in addition to the August lease, but disposition of that issue is likewise unnecessary to resolution of this appeal.

ly payments and in paying the insurance premiums required by the lease. He testified that he, in effect, abandoned his interest in the aircraft and turned the transaction over to Morey. Both he and Morey received notices of default from Kupka dated November 13, 1971.

After the Aero Commander was repaired, Morey and Kupka met in Anchorage, and on February 15, 1972, entered into a second agreement concerning the airplane. They executed both a lease and a purchase option. Both agreements were signed on Nasco Leasing forms. The lease provided for 36 monthly payments of $403.20 commencing March 1, 1972. In addition, it specified that Morey would deliver to Nasco Leasing a Cessna 185 in return for the credit of $7,300.00. The purchase option could be exercised, upon compliance with all the terms and conditions of the lease, by payment of $100.00. It is to be noted that the total of monthly payments required plus the $7,300.00 down payment and the option payment equals $21,915.20 or approximately the originally agreed value of $22,000.00 for the airplane.

Morey testified that the Nasco Leasing forms were used only as temporary substitutes since Kupka did not have the proper forms in Anchorage. Morey stated that Kupka kept these preliminary agreement papers and was to have prepared the necessary documents (presumably on National Aero Sales forms) upon his return to California. The revised documents were then to be sent back for Morey's signature. Morey further contended that the understanding included an agreement to credit the $5,600.00 payments made under the first lease towards the total sum due under the second lease and option.

Kupka, on the other hand, contended that the second contract was entirely separate and distinct from the August lease and was between Morey and Nasco Leasing rather than involving National Aero Sales. He asserted that, sometime after the plane was damaged and before the

February negotiations, title to the plane was transferred from National Aero Sales to Nasco Leasing. Although a bill of sale was executed, it was never recorded or introduced into evidence. Kupka, in fact, described this transfer between his two corporations as "nothing more" than a "book transaction". Thus, it is admitted that, at all relevant times, the aircraft was registered and recorded with the Federal Aviation Administration in the name of National Aero Sales. Furthermore, Kupka denied agreeing in February or at any other time to apply the payments from the first lease toward the second.

On February 25, 1972, Morey subleased the Aero Commander to Harry Clark of Aniak, Alaska for a minimum of $650.00 per month or $30.00 per hour of use (whichever was greater) on a month-to-month basis. The payments were to be made at the offices of Nasco Leasing in California, and a total of $1,700.00 was paid under this sublease. The Morey-Clark sublease terminated after two months, and Clark returned the aircraft to Anchorage, notifying Mr. Opp, the insurance agent who handled its coverage. Opp attempted unsuccessfully to contact Kupka in California and eventually canceled the policy due to delinquent payments. Kupka had taken out the policy on February 24, 1972 in the name of National Aero Sales. Clark's firm was included as an additional insured, but Mr. Opp testified that he was not informed of Morey's interest in the airplane.

There was conflicting testimony as to whether Kupka ever advised Morey that the insurance payments were due under the lease. The trial court resolved this issue in favor of Morey's contention that no notice was given to him. In any event, Kupka repossessed the airplane in May and flew it to California. At that time Morey's principal lease was paid in full for the four-month period commencing on March 1 as a result of Kupka's receipt of $1,700.00 pursuant to the Clark sublease.

Toward the end of 1972, Kupka resold the Aero Commander to a third party, Mr. French, for $16,500.00, apparently subject to Morey's option to purchase the plane for the same amount. Morey traveled to California, taking Felder with him to pilot the airplane back to Alaska, in the hope that he could negotiate a new financing arrangement with the purchaser of the airplane. Morey incurred $1,500.00 in expenses on this trip which proved fruitless.

Finally, pursuant to his claim that he was deprived of the rental value of the aircraft during the months it had been wrongfully retained, Morey testified that he had made tentative arrangements to lease the aircraft to others after the Clark sublease terminated. There was conflicting testimony as to the amount that could be obtained from such rentals. Kupka, in turn, counterclaimed for various sums due him under the first lease and for various expenses incurred by him as a result of the plaintiff's alleged breaches of both the first and second leases.

At the conclusion of the trial, the trial judge made the following findings of fact:

1. Although Nasco's standard leasing forms were used, they were meant to serve only as a temporary convenience and the February 15th agreement was actually between Morey and National Aero Sales represented by Kupka.

2. Nasco Leasing was not a party to *any* of the agreements Morey entered.

3. The February 15th agreement was merely a caretaker agreement which was executed for the interim period until the proper documents could be prepared and executed.

4. The payments made by Morey-Felder under the first lease—the $3,500 initial payment and the $2,100—were to be credited to the purchaser in the second lease-purchase agreement.

5. Morey never received any notice from Kupka concerning the cause of the so-called forfeiture.

Based on these factual findings, the trial court concluded that the repossession of the plane was wrongful and that Morey was entitled to restitution of all sums credited towards the purchase of the Aero Commander plus damages caused by the wrongful seizure of the plane. Thus, Morey was held entitled to the following:

First Lease (August 1971)

$3,500—amount paid by Morey on behalf of Felder pursuant to August Lease

2,100—amount paid by Morey and Felder on behalf of Felder pursuant to August Lease

$ 5,600

Second Lease (February 15, 1975)

1,700—rental payments from Clark sublease

7,300—value of Cessna 185 used by Morey as advance payment on Aero Commander

9,000

$14,600 SUBTOTAL

Incidental Damages:

1,500 —expenses of Morey's California trip

9,000 —loss of use due to Kupka's repossession based on finding that plane was worth $500 a month in rental value

$25,100 TOTAL—or $31,714.63 including costs and attorney's fees

In announcing his oral opinion, the trial judge made no reference to the merits of Kupka's counterclaim, nor did he make any awards or provide for any setoffs pursuant thereto.

The broad issues which we consider material to resolution of this appeal are:

1. Whether Kupka's repossession of the airplane was wrongful.

2. Whether it was error to enter judgment against National Aero Sales, since it was not named in the February 15, 1972 lease-purchase option agreement.

3. Whether there was error in the award of damages to Morey, particularly with reference to payments made under the first, Felder, agreement and with reference to loss of use of the aircraft.

4. Whether the trial court properly disposed of the issues raised by the counterclaim.

I

There was no dispute over the fact that the monthly installment payments under the February 15, 1972 Morey lease were not in arrears when Kupka repossessed the plane and removed it from the state. The only possibility of a breach of the lease terms is with reference to the requirement of Paragraph 3 of the lease that the lessee maintain insurance on the aircraft. This obligation is modified by Paragraph 16 which specifies:

Lessee may instruct Lessor to purchase insurance coverage on said Aircraft in companies and in amounts satisfactory to Lessee. In this event Lessee agrees to reimburse Lessor for the premium cost thereof, prior to the beginning of this lease. Lessor shall order this insurance from recognized and reputable insurance underwriters. Lessor shall have no contingent liability to Lessee by virtue of any insurance provisions, claims or settlements.

■■■ Since it was also undisputed that Mr. Kupka did in fact obtain the insurance, it would appear that this latter provision applied. There was a direct conflict in the testimony as to whether Kupka had notified Morey of the cancellation of insurance prior to repossession of the aircraft. The court found that "[n]o notice setting forth the seller's position or cause of forfeiture" was ever communicated to Morey. The court's finding of absence of notice resolves that conflict in favor of Morey. Moreover, Mr. Opp, the insurance agent who handled the policy, was unaware of Mr. Morey's interest in the plane, so that notice was not available to Morey from that source. Having undertaken to handle the insurance, Kupka cannot base a forfeiture on the cancellation of the coverage at least without first advising Morey of Kupka's election not to handle the coverage or the need for Morey to make further payments for premiums.[3]

■■■ Kupka makes one other argument in his attempt to justify the repossession. The lease provided that if the lessor deemed itself insecure, lessor, at its option, might terminate the lease and repossess

---

3. Since the $100.00 purchase option is nominal, the lease and option are to be regarded as a secured transaction subject to the provisions of art. 9 of the Uniform Commercial Code. *McGalliard v. Liberty Leasing Co.*, 534 P.2d 528 (Alaska 1975). The provisions of AS 45.05.782–.794, UCC § 9–501 to § 9–507 pertaining to default and repossession of collateral are therefore applicable although they were not discussed in the briefs or in the court's memorandum opinion. *See Moran v. Holman*, 514 P.2d 817, 819 (Alaska 1973). Notice is not required before a secured party is entitled, after a default, to seize collateral. AS 45.05.786, UCC § 9–503; *Weaver v. O'Meara Motor Co.*, 452 P.2d 87, 92 (Alaska 1969). We construe the court's finding of lack of notice as pertaining to placing Morey on notice that he would have responsibility for taking care of the insurance. In the absence of such notice, under the circumstances here involved, Morey cannot be held responsible for maintaining the insurance, and thus there was no breach of the lease terms. The repossession was wrongful, not because of the lack of notice of the repossession per se, but because there was no default justifying repossession.

and move the aircraft with or without notice to the lessee. Without citation of authority, Kupka alleges that Nasco Leasing deemed itself to be insecure, and thus had the right to repossess. For purposes of the decision in the instant case, we shall assume the validity of such "insecurity" clauses. However, as a minimum requirement for the enforcement of such a provision, the party invoking the clause must reasonably [4] and in good faith [5] believe that the prospect of payment or performance has somehow been impaired. Based on its findings of fact and conclusions of law, it is clear that the trial court believed that Kupka's repossession of the plane was neither reasonable nor in good faith. Again, the trial judge did not err in holding the repossession wrongful.

## II

National Aero Sales argues that it was not a proper party to the suit in that the lease was executed by Nasco Leasing. While admitting that the plane was registered in the name of National Aero Sales and that insurance was taken out in its name, Kupka alleges that, as a bookkeeping transaction between the corporations, a bill of sale had been issued to Nasco Leasing prior to February 15, 1972. The change in title, however, was never recorded as required by 49 U.S.C.A. § 1403.[6]

As noted above, the trial court found that the real parties to the February agreement were E. L. Morey, John Kupka and National Aero Sales Corporation, and that Morey made no contract with Nasco Leasing. It was found that the forms of Nasco Leasing were used for the interim period of time until proper documents could be prepared and executed.

In its opening brief, National Aero Sales merely refers to the fact that the formal lease was with Nasco Leasing, but in its reply brief, reference is made to the statute of frauds AS 09.25.020(3) and the parol evidence rule as prohibiting testimony to vary the written agreement. The statute of frauds was never raised as an affirmative defense as required by our rules [7] nor was its applicability argued before the trial court. Under these circumstances, we refuse to consider the issue pertaining to the statute of frauds on this appeal.

Objection was raised at the trial to the admission of parol evidence to add to or vary the terms of the February 15, 1972 lease. If the lease is to be regarded as an integrated agreement,[8] the parol evidence rule would apply prohibiting testimony seeking to vary the clear and unambiguous terms of the agreement.[9] In determining whether there has been an integration

---

4. *See* AS 45.05.178, UCC § 2–609; *Ellis Manufacturing Co. v. Brant*, 480 S.W.2d 301 (Tex.Civ.App.1972).

5. AS 45.05.024, UCC § 1–203; *Sheppard Federal Credit Union v. Palmer*, 408 F.2d 1369 (5th Cir. 1969). *See* AS 45.05.034, UCC § 1–208.

6. 49 U.S.C.A. § 1403(c) provides that unrecorded conveyances of aircraft are invalid "against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual knowledge thereof" . . . . .

7. Alaska R.Civ.P. 8(c) specifies that in pleading to a preceding pleading a party shall set forth affirmatively the statute of frauds.

8. An integrated writing "is a document which the parties intended as the complete and final

embodiment of the terms of their agreement". *Royal Industries v. St. Regis Paper Co.*, 420 F.2d 449, 452 (9th Cir. 1969).

9. The parol evidence rule as traditionally conceived is well stated by Professor Corbin:
 When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotaitions will not be admitted for the purpose of varying or contradicting the writing.
 3 Corbin, Contracts § 573 at 357 (1960) (footnote omitted). *Accord,* 4 Williston, Contracts § 631 at 951–53 (3rd ed. Jaeger 1961). The rule has been developed to effectuate two important policies. The first has its basis in the assumption that the written evidence is more accurate than human memo-

of the contract, however, the parol evidence rule is not applicable; the rule cannot be invoked until it is established that the parties have assented to a particular writing as the complete and accurate integration of their contract.[10]

▉ Therefore, it first must be determined whether the February 15 lease is to be regarded as a complete and accurate integration of the contract. Resolution of the question is dependent on the intent of the parties,[11] with one line of authority requiring such intent to be derived solely from the face of the instrument,[12] while another view allows the court to consider any relevant extrinsic evidence.[13] The issue is further complicated by the fact that the lease contains an integration clause.[14] Again, there is a split of authority between those holding that such a clause has a conclusive effect as to the parties' intent to integrate,[15] and those which state that the clause merely strengthens the presumption that a written contract is the final repository of the agreement.[16] Even these latter cases, which we believe advance the better view, hold that contracts containing such clauses are partially integrated so that parol evidence may not be used to prove a provision that contradicts or is inconsistent with a specific term of the contract (other than the integration clause itself). Thus,

---

ry. *Masterson v. Sine*, 68 Cal.2d 222, 65 Cal.Rptr. 545, 436 P.2d 561, 564 (1968); *Garrett v. Ellison*, 93 Utah 184, 72 P.2d 449 (1937). By elevating this assumption to the level of a presumption of law, it renders contractual undertakings more certain when they are reduced to an integrated writing. *Zone Co. v. Service Transp. Co.*, 137 N.J.L. 112, 57 A.2d 562 (1948); *Tees v. Lee*, 234 Wis. 607, 291 N.W. 792 (1940). Secondly, it reduces the opportunities for innocent parties to be victimized by the fraud or perjury of others. *Masterson v. Sine*, 65 Cal.Rptr. at 548, 436 P.2d at 564; *In re Tomarchio*, 269 F. 400 (E.D.Mo.1920); *Bauer v. Monroe*, 117 Mont. 306, 158 P.2d 485, 489 (1945).

The rule, however, as interpreted by most courts is far from absolute and is subject to many well-established exceptions not relevant here. For instance, extrinsic evidence is admissible to interpret ambiguous or uncertain terms in a contract. *Day v. A & G Constr. Co., Inc.*, 528 P.2d 440 (Alaska 1974); *Smalley v. Juneau Clinic Bldg. Corp.*, 493 P.2d 1296, 1305 (Alaska 1972).

10. 3 Corbin, Contracts § 573 at 360 (1960); *Royal Industries v. St. Regis Paper Co.*, 420 F.2d 449, 452 (9th Cir. 1969); *United States v. Clementon Sewerage Authority*, 365 F.2d 609, 613–14 (3rd Cir. 1966).

11. 9 Wigmore, Evidence § 2430 (3rd ed. 1940), quoted approvingly in *Luther Williams, Jr., Inc. v. Johnson*, 229 A.2d 163, 165 (D.C. App.1967). *Masterson v. Sine*, 65 Cal.Rptr. at 547, 436 P.2d at 563.

12. *Beaudry Motor Co. v. Truax*, 84 Ariz. 126, 324 P.2d 1006, 1009 (1958); *Masterson v. Sine*, 65 Cal.Rptr. at 547, 436 P.2d at 563; *Coker v. Hudspeth*, 308 P.2d 291, 294 (Okl. 1957); *Webster v. Harris*, 189 Or. 671, 222 P.2d 644, 647 (1950); *Logsdon v. Trunk*, 37 Wash.2d 175, 222 P.2d 851, 854 (1950).

13. *Cf.* note 9, *supra.* 3 Corbin, Contracts § 573 at 360 (1960). *See* Comment (a) to Restatement, Contracts § 228 (1932) which states: "That a document was or was not adopted as an integration may be proved by any relevant evidence".

14. Paragraph 19 of the February lease-purchase contract contained the following integration or merger clause:

No representations, warranties, promises, guarantees or agreements, oral or written, expressed or implied, have been made by either party hereto with respect to this lease or the Aircraft, except as expressly provided herein.

15. 3 Corbin, Contracts § 578 (1960); 4 Williston, Contracts § 633 at 1014 (3rd ed. Jaeger 1961); *Boro Hall Corp. v. General Motors Corp.*, 164 F.2d 770 (2nd Cir. 1947). *See Masterson v. Sine*, 65 Cal.Rptr. at 547, 436 P.2d at 563.

16. *Luther Williams, Jr., Inc. v. Johnson*, 229 A.2d 163, 165 (D.C.App.1967); *Matthews v. Drew Chemical Corp.*, 475 F.2d 146, *reh. denied*, 477 F.2d 596 (5th Cir. 1973). In addition to the *Luther Williams* and *Matthews* cases, see *Rinaudo v. Bloom*, 209 Md. 1, 120 A.2d 184, 189 (1956): "Doubtless, however, such a clause strengthens, and it may go beyond, the presumption of integration upon which the parol evidence rule proceeds; but it is not invariably conclusive and its coverage is a matter of interpretation"; *Whitney v. Halibut, Inc.*, 235 Md. 517, 202 A.2d 629 (1964) (following *Rinaudo*); *Atlanta Chemical Co. v. Hardin Bag Co.*, 49 Ga.App. 748, 176 S.E. 772 (1934).

while parol evidence might be used to provide consistent additional terms, it generally is impermissible to vary or alter the terms which are contained in the partially integrated writing.[17] We have indicated previously that the lease and option are to be treated as a secured transaction under the provisions of the Uniform Commercial Code.[18] AS 45.05.052 of the Code specifies:

> Terms with respect to which the confirmatory memoranda of the parties agree, or which are otherwise set out in a writing intended by the parties as a final expression of their agreement with respect to the terms included in the writing, may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement, but may be explained or supplemented
>
> (1) by course of dealing or usage of trade (§ 28) or by course of performance (§ 64); and
>
> (2) by evidence of consistent additional terms unless the court finds the writing was intended also as a complete and exclusive statement of the terms of the agreement.

█ The collateral agreements sought to be proved by Morey during the trial were: (1) that the lease and option were with National Aero Sales rather than Nasco Leasing and were intended to be re-executed on proper forms, and (2) that the earlier payments under the Felder lease would be credited toward the purchase price. Both appear to vary or alter the written terms of the agreement[19] rather than to prove consistent additional terms, and we, therefore, conclude that ordinarily parol evidence may not be used for the purpose of establishing their existence.

In *Braund, Inc. v. White*, 486 P.2d 50, 56 (Alaska 1971), we explained, however, that the Code did not preclude the remedy of reformation.[20] Williston states that "[w]here . . . a written agreement is not in conformity with the actual intention of the parties in a material matter, a court of equity will reform the writing in accordance with that intention if innocent parties will not be affected thereby."[21]

Sec. 507 of the Restatement of Contracts (1932) points out that:

> Where circumstances justify reformation of a writing, affecting the contractual relations of the parties to the writing, a court may in its discretion without a preliminary decree of reformation give effect to the transaction as if it had been reformed. This also is permissible where the transaction is oral if this is the only reason precluding a decree for reformation.

█ Before a contract can be reformed, however, a substantial burden of proof must be met.

It is essential in order to obtain a decree rescinding or reforming a written

---

17. For instance, in *Matthews v. Drew Chemical Corp.*, 475 F.2d at 149–50, the Fifth Circuit specifically refused to allow the trial court to utilize the parol evidence it had admitted on the integration question to vary the express terms of the contract or to add inconsistent provisions thereto. The questions of whether a document constituted a completed contract or whether a party is entitled to reformation involve basically issues of fact with differing burdens of proof. The trial court must determine whether or not the parties entered into a completed contract and whether the written document embodies such agreement. In determining this, the court will use a preponderance of the evidence test. If the court finds the parties did enter into a completed contract but that there are claims that the terms should be modified or changed because of mistakes, fraud, etc., in setting forth the terms, then the court must use the standard of "clear and convincing proof" to determine whether the contract should be reformed.

18. *See* note 3, *supra.*

19. We are not here confronted with a question pertaining to ambiguous provisions. *See Day v. A & G Constr. Co.*, 528 P.2d 440, 443 n. 4 (Alaska 1974).

20. AS 45.05.006.

21. 5 Williston, Contracts § 1547 at 4336 (rev. ed. Williston & Thompson 1937), *accord* Restatement, Contracts § 504 (1932).

conveyance, contract, assignment or discharge for mistake, that the facts necessary for the allowance of the remedy shall be proved by clear and convincing evidence and not by a mere preponderance.[22]

In light of the more stringent burden of proof borne by a party seeking reformation, the parol evidence rule is inapplicable in actions for reformation.[23]

The trial judge in his memorandum opinion stated only that Morey made no contract with Nasco Leasing, and that the contract was "between E. L. Morey and John Kupka of National Aero Sales Corporation". We do not know what standard of proof was employed by the trial court, and since specific reference was not made to reformation of the contract, we cannot assume that the court's finding was based on clear and convincing evidence rather than on a mere preponderance.

There was, however, ample evidence presented from which the court could have made such a finding utilizing the more stringent standard. First, record title to the airplane was in the name of National Aero Sales. Second, Kupka secured insurance in favor of that company. Third, it seems that Kupka retained the only copy of the lease form, and that Morey did not keep a copy which is consistent with Morey's testimony that Kupka was to have it rewritten on the National Aero Sales forms. Fourth, not only was the bill of sale from National Aero Sales to Nasco Leasing not recorded, it was not even introduced into evidence. Fifth, the trial judge who had the benefit of oral testimony apparently found Morey's testimony more convincing than Kupka's on most of the crucial points. Sixth, the earlier Felder contract involving the same Aero Commander was with National Aero Sales. Nevertheless, we must remand in order to permit the trial court to determine whether there was sufficient proof to justify reformation of the contract.

### III

Regardless of whether or not the trial court, on remand, determines that there was clear and convincing evidence justifying a reformation of the contract holding that National Aero Sales was intended to be a party, the judgment against Kupka will remain in effect. We, therefore, must resolve the remaining issues as to damages and the counterclaim.

With reference to the contention that under the lease agreement, Morey was to be given credit on the purchase price for payments made under the August 8, 1971 agreement with Felder, we are required to make an analysis identical to that discussed previously pertaining to the parol evidence rule. Much more difficult problems are encountered, however, in this instance.

In Morey's complaint, it is alleged that it was agreed that the price of the airplane would be $22,000.00 and that Morey was to have credit for the payments under the earlier Felder agreement ($5,600.00), as well as for the Cessna aircraft which was valued at $7,300.00 or a total of $12,900.00.[24] But the February 15 agreement provided in the handwritten part, as opposed to the printed form material, for 36 equal monthly payments of $403.20 or an additional $14,515.20. In addition, there was the $100.00 option price so that the total sum would amount to $27,515.20 rather than $22,000.00. The only conceivable explanation would be that the parties some-

22. Restatement, Contracts § 511 (1932); *Stephenson v. Ketchikan Spruce Mills, Inc.*, 412 P.2d 496 (Alaska 1966); *Durkee v. Busk*, 355 P.2d 588 (Alaska 1960); *Heckman and Shell v. Wilson*, 487 P.2d 1141 (Mont.1971); *Mignot v. Parkhill*, 247 Or. 465, 430 P.2d 1007 (1967); *Neal v. Green*, 71 Wash.2d 40, 426 P.2d 485 (1967).

23. *Gablick v. Wolfe*, 469 P.2d 391 (Alaska 1970); *Collins v. Parkinson*, 96 Idaho 294, 527 P.2d 1252 (1974).

24. The complaint alleges payments under the Felder lease of $6,100.00 and a credit for the Cessna of $7,500.00, but the proof was limited to the sums of $5,600.00 and $7,300.00.

how had the specially inserted monthly payment provision specify a substantially incorrect number of months. On the other hand, if the earlier $5,600.00 payment is not added to the contract, the amount specified plus the $100.00 option comes to $21,915.20 or almost $22,000.00.

Moreover, when the parties desired to specify a credit for the Cessna, this was expressly set forth in a handwritten addition to the printed form in which receipt for the sum of $7,300.00 was acknowledged.

In this instance, we are not confronted with a problem arising out of the use of a standard form bearing a different corporate name, but with provisions that were specially handwritten into the agreement. If the parties had intended to include the additional credit for payments made under the Felder agreement, it could just as easily have been inserted as the other similar credit. Our examination of the record before us leads us to the conclusion that despite the weight to be given to the trial court's evaluation of demeanor testimony, it would not as a matter of law be possible to find proof by clear and convincing evidence that the parties intended that the earlier payment of $5,600.00 apply on the contract price for the aircraft.

Assuming that the court does reform the contract so as to substitute National Aero Sales as a party, Morey's damages would be limited to the $7,300.00 credit, the $1,700.00 paid under the Clark lease, the $1,500.00 expended on the trip to California in a vain attempt to recover the aircraft and an appropriate sum for the loss of use of the airplane.

As to the amount allowed for loss of use, Morey had testified that he had tentatively arranged to rent the aircraft for sums in the neighborhood of $1,000.00 or $1,500.00 per month after the Clark sublease terminated. Kupka believed that $850.00 a month was the highest obtainable figure, and that this rental could not be sustained over a long period of time, making the average monthly rental even less than that amount. The trial court allowed $9,000.00 for loss of use based on an 18-month period.[25] The judge stated that the sum of $500.00 per month was more reasonable than $1,000.00 or $1,500.00, but he did not indicate whether the $500.00 sum was after deduction of the lease payments required to be paid by Morey.

Morey takes the position that the $500.00 was the net rental after deduction of the lease payments, while Kupka argues that the trial court stated the gross rental without deduction of installment payments due under the lease. Since no arguments were presented to us or to the court below questioning the propriety of the deduction per se, we do not deem it necessary to discuss that possibility. We, therefore, must remand the case for a determination by the trial court as to the net amount due for the loss of use in the event that no such deduction was previously made.[26]

### IV

Kupka counterclaimed for various sums due under the first lease and for various expenses incurred as a result of breaches of both the first and second leases. The court did not expressly rule on the counterclaims and, in fact, made no reference to them at all in its decision.

25. The parties have not questioned on this appeal the period of time for which loss of use was awarded.

26. Paragraph 8 of the lease between Morey and Nasco Leasing Company provided:
 This lease, except as hereinafter provided, is irrevocable for the full term thereof and until the aggregate lease payments provided for herein have been paid by lessee. Lease payments shall not abate during the term hereof because lessee's right to possession of the aircraft has been interrupted or has terminated or because the aircraft has been repossessed or for any other reason.

 Kupka argues that Morey had a continuing obligation to pay rent under this paragraph, and thus the value of the Cessna and the sublease payments by Clark are "simply offset against this continuing rental obligation of Morey". It is obvious, however, that Kupka cannot claim continuing rental payments after he had wrongfully repossessed the airplane.

Alaska Rule of Civil Procedure 52(a) provides:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment . . . .

Although some of the counterclaims find no support in the record and others are implicitly negated by the lower court's findings in the principal case brought by Morey, the necessity of a remand is clear with regard to the remaining counterclaims in light of Civil Rule 52(a), assuming that the merits of the defendants' claims need be reached.

Morey argues that National Aero Sales is not entitled to bring the counterclaim since it failed to allege and prove its corporate authority to do business in Alaska as required by AS 10.05.720.[27]

■■■■ Recently, in *King v. Petroleum Services Corp.*, 536 P.2d 116 (Alaska 1975) (per curiam), we had an opportunity to decide the effect of such a failure to specifically plead the opposing party's lack of capacity to sue arising under AS 10.05.720. There the plaintiff corporation had made the proper allegations of corporate authority in its complaint, but it apparently did not *prove* that it had paid its annual corporate taxes and filed the annual report called for by the statute. The court held that since the defendant had not specifically denied the plaintiff's capacity to sue in his answer, the defense was not properly raised under Alaska Rule of Civil Procedure 9(a)[28] and, therefore, was waived.[29] The *King* case is controlling here as Morey did not deny the corporation's capacity to sue.[30]

■■■■ The next question posed by Morey is whether the counterclaim is fatally defective to the extent that it seeks damages from him for breach of the first lease because it fails to make Felder, the lessee and principal obligor, a party defendant to the suit. Morey argues that in a direct action brought by a creditor or lessor against a guarantor, such as Morey, the principal debtor (Felder) would be an indispensable party whose joinder was mandated by Alaska R.Civ.P. 19(a).[31] Once it is estab-

---

27. AS 10.05.720 provides in pertinent part: No . . . foreign corporation may commence or maintain a suit, action or proceeding in a court in the state without alleging and proving that it has paid its annual corporate tax last due and has filed its annual report for the last calendar or fiscal year for which the report became due.

28. Alaska R.Civ.P. 9(a) provides in pertinent part:
 It is not necessary to aver the capacity of a party to sue or be sued . . . . . When a party desires to raise an issue as to the . . . capacity of any party to sue or be sued . . . , he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge.
 *See Smith v. Sellar*, 371 P.2d 809 (Alaska 1962) (general denial is not enough to raise issue of capacity to sue); *Brown v. Music Inc.*, 359 P.2d 295 (Alaska 1961) [decided under F.R.C.P. 9(a)].

29. Lack of corporate capacity to sue is also an affirmative defense which must be pleaded under Alaska R.Civ.P. 8(c). *Norman M. Morris Corp. v. Weinstein*, 466 F.2d 137 (5th Cir. 1972) [F.R.C.P. 8(c)].

30. Even if the capacity to sue had been denied, it is well established that a corporate defendant which has not complied with statutory requirements for commencing an action may still be allowed to prove a counterclaim as a setoff, although the court cannot render an affirmative judgment in its favor. *Alaska Mines and Minerals, Inc. v. Alaska Ind. Bod.*, 354 P.2d 376, 379 (Alaska 1960), in which we stated that "the statute is aimed only at a corporation that wishes to 'commence or maintain' a proceeding, and not at one which defends against an action instituted by another"; *Boston Towboat Co. v. John H. Sesnon Co.*, 199 F. 445, 447 (W.D.Wash.1912); *North Star Trading Co. v. Alaska-Yukon-Pacific Exposition*, 68 Wash. 457, 123 P. 605, 606 (1912).

31. Alaska R.Civ.P. 19(a) provides:
 Subject to the provisions of Rule 23 and of subdivision (b) of this rule, persons having a joint interest shall be made parties and be joined on the same side as

lished that an indispensable party is not before the court, Morey suggests that the court is obliged to dismiss the action for lack of subject matter jurisdiction pursuant to Alaska Rule of Civil Procedure 12(h).[32]

Morey relies solely on the case of *Nordin v. Zimmer*, 373 P.2d 738 (Alaska 1962), as authority for its position that Felder was an indispensable party. In that case, the Supreme Court of Alaska held that "[j]oint obligees are indispensable parties to an action between themselves and the obligor to enforce contract rights".[33] This is indeed the general rule in cases where joint obligees are involved as plaintiffs,[34] but the instant case is readily distinguishable since the counterclaim involves an action brought against Morey who was not a joint obligee but a guarantor of Felder, the obligor. Kupka and National Aero Sales were free to assert against him their distinct rights arising out of the separate collateral guaranty contract without joining the obligor on the lease.[35]

 Morey also seems to contend that demand should have been made on Felder before commencing any action against the guarantor. It is unnecessary to determine whether the evidence establishes the absence of such demand, for it is well settled that a creditor upon default of the principal debtor,[36] may proceed immediately against an absolute guarantor without making a formal demand on the debtor for payment[37] and without first having proceeded against the debtor.[38] Thus, as a matter of law, no demand was necessary, and the counterclaim against Morey, alone as guarantor, must be decided on its merits.

A number of the items in the counterclaim concern the first contract. Kupka claimed $6,000.00 in delinquent monthly rentals under the August lease agreement, but there were payments (including the $1,500.00 security deposit) of $5,600.00. It will be necessary for the trial court on remand to ascertain the amount, if any, which was due for rentals under the first lease.

 Kupka also claimed $2,250.00 as the cost of a new Aero Dyne engine purchased after the plane was damaged in the fall of 1971. The engine was purchased by the insurance company. Kupka admitted that, although he was billed for this

---

plaintiffs or defendants. When a person who should join as a plaintiff refuses to do so, he may be made a defendant or, in proper cases, an involuntary plaintiff.

32. Alaska R.Civ.P. 12(h) provides in part: A party waives all defenses and objections which he does not present either by motion as hereinbefore provided or, if he has made no motion, in his answer or reply, except (1) . . . the defense of failure to join an indispensable party . . . may also be made by a later pleading, if one is permitted, or by motion for judgment on the pleadings or at the trial on the merits, and except (2) that, whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. The objection or defense, if made at the trial, shall be disposed of as provided in Rule 15(b) in the light of any evidence that may have been received.

33. 373 P.2d at 742.

34. Bry-Man's Inc. v. State, 312 F.2d 585 (5th Cir. 1963). *See* 3A Moore Federal

Practice ¶ 19.11 at 2361–62 (2nd ed. 1974) wherein it states:

This rule affords protection to the obligor and generally works no hardship upon the obligees, since normally, it is to the interest of the obligees to join in the enforcement of their joint right, and where one refuses he may be made a party defendant or, we believe, an involuntary plaintiff in a proper case. (footnotes omitted)

35. *Janeway v. Vandeventer*, 172 Okl. 379, 45 P.2d 79, 82 (1935); *Butte Machinery Co. v. Carbonate Hill Mining Co.*, 75 Mont. 167, 242 P. 956 (1956).

36. Felder's default on the August lease was not disputed.

37. *Texas Water Supply Corp. v. Reconstruction Finance Corp.*, 204 F.2d 190 (5th Cir. 1953); *Beach v. Beach*, 141 Conn. 583, 107 A.2d 629 (1954).

38. *Terry v. Tubman*, 92 U.S. 156, 23 L.Ed. 537 (1876); *Robey v. Walton Lumber Co.*, 17 Wash.2d 242, 135 P.2d 95 (1943).

amount, he had never in fact paid for the engine. The claims are four years old now, and it would be fruitless to allow Kupka to pursue this claim against Morey unless or until he is sued for that amount. In that case, he could interplead Morey. At this time, he cannot be allowed to act as a collection agent for a third party.

Kupka also claimed $2,000.00 as the amount paid toward the deductible portion of Felder's insurance policy. But Mr. Opp testified that nearly all of the $2,000.00 deductible was credited to Felder for services performed in repairing the aircraft. Kupka, on the other hand, introduced evidence that he had paid some $2,000.00 prior to the plane's release from the repair shop. An annual inspection was made and other improvements performed unrelated to the damage claim, but whether any amount was paid by Kupka on the deductible portion of the policy would require a finding by the trial court.

In addition, Kupka claimed that he paid $1,400.00 to Insurance, Inc. for Felder's delinquent insurance premiums. Again, this claim, like others discussed above, requires resolution by the trial court.

 The sum of $1,000.00 was claimed for "transporting the plane from Point Barrow to Anchorage". Since the only plane referred to in the counterclaim was the Aero Commander and since the testimony was undisputed that it was delivered by Mr. Felder, there can be no recovery on this claim.[39]

 Claims of $1,000.00 for transporting the airplane to California after its repossession and of $850.00 in insurance costs while the Aero Commander was being held by Kupka after the repossession and prior to resale constitute expenses of the repossession which we have held to be wrongful and thus cannot be recovered. Likewise, the $500.00 expenditure for removing Aniak Flying Service's name from the plane and to repaint its surface appears to be a gratuitous expense incurred in connection with the wrongful repossession.

 Finally, Kupka claimed that a radio valued at $1,250.00 was missing from the aircraft. The testimony concerning the whereabouts of the radio was in conflict. If the radio was missing when the aircraft was picked up by Kupka, it would appear that the value of the radio would constitute a legitimate item of counterclaim. The factual questions as to the missing radio must be resolved by the trial court.

In conclusion, the judgment below is affirmed in part, but the case is remanded for resolution of the questions pertaining to whether there was clear and convincing proof that the parties intended the contract

---

**39.** It was Morey's obligation to deliver the Cessna 185 from Barrow to Anchorage. Kupka did introduce evidence that he spent $394.14 to accomplish this. Counsel indicated that he was prepared to make amendments to conform to the proof at the close of trial, but no such proposed amendment was filed. There was objection to the testimony as being beyond the scope of the counterclaim. The issue, therefore, was not tried with the consent of Morey, and Alaska R.Civ.P. 15(b) is inapplicable. Civil Rule 15(b) provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

See *Rollins v. Leibold*, 512 P.2d 937 (Alaska 1973); *Transamerica Title Insurance Co. v. Ramsey*, 507 P.2d 492 (Alaska 1973). Therefore, this item must be considered waived.

to refer to National Aero Sales rather than Nasco Leasing, the clarification of the amount to be awarded for loss of use of the aircraft and resolution of the various counterclaims in accordance with this opinion.

Affirmed in part, reversed in part and remanded.