HENRY McCLEARY TIMBER COMPANY, Appellant, v. C. A. SEWELL and ORENE H. SEWELL, His Wife, Respondents.

No. 3912

July 17, 1956.                                301 P.2d 1047.

See also 72 Nev. 7, 292 P.2d 197.

*James A. Callahan,* of Winnemucca, and *Anderson, Kaufman & Anderson,* of Boise, Idaho, for Appellant.

*Orville R. Wilson, of Elko,* for Respondents.

# OPINION

By the Court, MERRILL, C. J.:

This is an appeal taken by the defendant in the court below from money judgment for the plaintiffs and from judgment against the defendant upon its counterclaim. The appellant contends that in neither respect does the evidence support the judgment or the findings of the trial court which sat without jury.

Plaintiffs Sewell, residents of Elko County, possess ranch properties and range rights in northern Nevada and southern Idaho. The defendant corporation has ranch properties in Humboldt County, Nevada. The action arose out of an agreement of agistment between the parties, whereby plaintiffs were to care for certain

of defendant's cattle for a period of two years. Following an accounting in the trial below the court found that under the agreement charges against the defendant totaled $106,178.41, while credits amounted to $67,047, leaving a balance due in the sum of $39,131.41. Judgment was rendered against the defendant in this amount.

Upon this appeal the defendant's sole attack upon this judgment is against the manner in which the court computed the amount of hay provided to defendant's cattle, for which under the agreement defendant was to pay $15 a ton. The court found that 5,025.4 tons had been provided for a total sum due of $75,381. The defendant contends that 4,273 tons had been provided for a total sum due of $64,095; that the court's judgment is excessive in the sum of $11,286. The difference results from the manner in which weight was computed from the volume of hay in cubic feet, as to which figure there was no dispute.

The agreement provided that the hay was to be "measured according to the so-called 'government rule'." The parties are in dispute as to the rule to which the agreement refers. Plaintiffs contend that it refers to the "Quartermaster Rule": a method of measuring hay in stacks to determine its volume in cubic feet. The court adopted this view and received evidence of local custom as to the method of computing weight in conjunction with a determination of volume by means of the Quartermaster Rule.

Defendant contends that the agreement refers to the current methods of measurement of both volume and weight as recommended by the United States Department of Agriculture. "Leaflet No. 72" of the department was introduced in evidence. It was originally issued in 1931 and has never been superseded.

It should be noted, however, that the agreement does not specify the "government rule" or the "approved government rule", but rather the "so-called government rule." There is no evidence that Leaflet 72 has ever been

known as or called "the government rule." The leaflet itself refers to the Quartermaster Rule as the "so-called government rule." A reading of the bulletin indicates that its author proposes new rules for the measurement of hay in stacks and criticizes the Quartermaster or "so-called government rule" as inaccurate. The Department of Agriculture apparently agrees with the author that his rule is preferable to the Quartermaster or so-called government rule. Yet the evidence is conclusive that the parties to the agreement were satisfied with the Quartermaster Rule. The measurement of the volume of the hay in stacks upon which the parties agreed was actually done by means of the Quartermaster Rule.

Under the circumstances we are fully satisfied that the record supports a determination that the agreement by its language had reference to the Quartermaster Rule and not to Leaflet No. 72. Since there is no evidence that the Quartermaster Rule extends to a determination of weight from volume, it cannot be said that the agreement specified the method by which such determination was to be made. The court considered the method proposed by Leaflet 72 and, in the light of local climatic conditions, rejected it as less accurate than the method followed by local custom. The record amply supports this conclusion, and the judgment in this respect must be affirmed.

Defendant counterclaimed for $220,000 suffered through loss of cattle due to alleged acts and neglect on the part of the plaintiffs while the cattle were in their care under contract of agistment. Liability is dependent on proof of fault. Bramlette v. Titus, 70 Nev. 305, 267 P.2d 620. The trial court found that any loss suffered was not attributable to plaintiffs. The findings are expressed at length and are in all respects supported by the record.

Defendant's counterclaim may be considered in three parts: Loss of cattle, loss of bulls, loss of calf crop.

First, as to the cattle: In early April, 1951, defendant

delivered to plaintiffs on their range in Idaho 2,701 head of cattle. Toward the end of June the cattle, by then commingled with cattle belonging to plaintiffs, were moved to summer range. A count was then made, showing 298 head less than had been delivered. It is for this shortage that plaintiffs remained accountable upon ultimate return of the cattle to defendant in 1953. Upon proof of this loss the burden of going forward with the evidence shifted to plaintiffs. Bramlette v. Titus, supra. The record establishes that the plaintiffs have clearly met this burden.

When the cattle were delivered to plaintiffs they were in weakened condition. They had been trailed from defendant's range in Nevada and had suffered a severe snow storm enroute during which the herd had been scattered and over 450 head had not been recovered. They were rested for one day before being placed on plaintiffs' range. They were tired and thin.

The range on which they were placed was an extensive and rugged desert range. It embraces the major portion of five townships and is cut by streams and by canyons of considerable depth.

The record establishes the tendency of young cattle, such as were those in this herd, to drift back from new and strange ranges to their home range. Approximately 100 head of the missing cattle were subsequently found on an adjoining range by the adjoining rancher and were by him headed back to their home range.

The average annual death and stray loss throughout the general area was shown to be from one percent to 10 percent. In plaintiffs' experience their average loss was four percent.

From these facts the trial court concluded that the loss "resulted from drifting, or natural causes resulting from the weakened condition of the cattle." The record supports this conclusion.

Nor is it established that the loss might have been avoided but for the negligence of the plaintiffs. At all

times plaintiffs maintained riders to keep the cattle spread out on the range and on its waters, in accordance with good range practice. Defendant's herd received the same care as did plaintiffs' cattle, with which it was commingled. After the loss was disclosed riders twice were sent back to search for missing cattle. Sixty-nine head were recovered. A third search was made by airplane after winter had set in. The record supports the court's findings and its conclusion that defendant had failed to fix responsibility for the loss upon plaintiffs.

Second, as to the bulls: In June, 1951, 49 young bulls were turned out on the range. That fall only 36 were recovered. When delivered, the bulls were young and fat and had not yet recovered from deep branding. They were turned out on rugged summer range on order of the defendant and contrary to advice of the plaintiffs that they be conditioned for two weeks before being turned out. This would also permit the bulls to be turned out on less rugged range, to which the cattle herd, in the course of its summer grazing, was working its way. The bulls were too few by one-half to serve the herd.

In June, 1952, defendant delivered an additional 50 head of bulls. An indeterminate number of the bulls delivered had anaplasmosis, a serious blood disease of cattle which may well result in death. Of the total of 99 bulls delivered 48 were returned.

From these facts the court concluded that the bull loss was not due to plaintiffs' negligence or lack of care but was due to defendant's supplying too few bulls; to the fact that they were not in condition to be turned out on rugged open range; to illness, and to natural causes. Under the record we find no error in this respect.

Third, as to the calf crop: Defendant claims that under proper care the herd should have produced 1,600 calves in 1951 and 1952; that only 469 calves were produced. The court attributed this loss to an inadequate

number of bulls, the condition of the bulls, and the fact that in 1951 some of the heifers were too young to be bred. We find no error in this conclusion under the record.

Judgment affirmed.

EATHER, J., concurs.

(BADT, J. participated in the deliberations and concurs in the result, but was absent at the time of filing of the opinion.)