**Walt BAKER and Dave Novelle,
Plaintiffs and Respondents,**

v.

**Kenneth HANSEN, Defendant
and Appellant.**

No. 18094.

Supreme Court of Utah.

June 8, 1983.

*Industrial Commission,* 104 Utah 242, 139 P.2d 208 (1943).

Kenneth Hansen pro se.

Terry L. Christiansen, Park City, for plaintiffs and respondents.

HALL, Chief Justice:

Plaintiffs brought this action to enforce an agistor's lien on defendant's cattle.[1] Defendant counterclaimed for damages alleging, *inter alia,* breach of contract. The district court entered judgment against defendant in the amount of $32,140, and dismissed the counterclaim. Defendant appeals.

Defendant Kenneth Hansen is a cattle rancher from Evanston, Wyoming. As a result of a severe drought in 1979, he was forced to locate new pasture for his herd of cattle. He entered into an oral agreement with plaintiff Walt Baker (hereinafter Baker), a cattle rancher from Kamas, Utah, whereby Baker would pasture and care for his cows for a period of one year in exchange for 60 percent of the calf crop delivered by the impregnated cows during that year, and reimbursement for the care and feeding of the remaining livestock. Defendant was to have the cows pregnancy

tested so that Baker would not be feeding cows for which he would not be compensated in calves. This testing, however, was never performed.

On October 16 and 24, 1979, defendant delivered to the Baker Ranch 125 cows, 85 yearlings, 5 fall calves and 1 bull. Just prior to delivery, the cows were examined by Dr. Stanley Hull, who testified that they were in very good condition. After the long haul by truck from Idaho (where they had formerly been pastured) to Kamas, their condition was not quite as good, although they were reported to be in good enough shape to survive the approaching winter.

At the time the oral agreement between defendant and Baker was entered into, defendant had not actually seen Baker's pasture, nor was he aware that it had recently been occupied by another herd of livestock. Upon delivering the cattle, he observed the condition of the pasture to be well grubbed and fed out. Notwithstanding this condition, defendant left the cattle in Baker's care, pursuant to the agreement.

In mid-November, 1979, Baker began feeding hay to defendant's cattle. Toward the end of November, Baker, observing that his 150-ton supply of hay would soon be exhausted, sought financial assistance to purchase additional hay. He secured such assistance from plaintiff Dave Novelle (hereinafter Novelle), who, over the course of the winter months, provided some $15,555 for hay, feed and veterinary expenses.

On December 31, 1979, defendant visited Baker's ranch and discovered that his cattle had lost considerable weight and that 2 of the yearlings had died.[2] Consequently, on the following day (January 1, 1980), with Baker's approval, defendant removed the remaining 83 yearlings, 10 of the 125 mature cows and the 5 fall calves from the ranch. Baker was thus left with 115 mature cows and 1 bull.

---

1. Pursuant to U.C.A., 1953, § 38–2–1.

2. Regarding the death of the 2 yearlings, Baker testified that "one of them the neighbor's dog killed and one fell through the ice in the canal."

Baker, who was not present when defendant took the livestock on January 1, 1980, claims that only 104 mature cows were remaining after that date, rather than 115, and that defendant probably took 11 more cows than he had accounted for. Baker's son, however, who was present when the cattle were removed, verifies defendant's testimony that only 10 cows were taken by defendant at that time. Therefore, despite Baker's claim to the contrary, it was he, not defendant, who was unable to account for these 11 missing cows.

At the time the cattle were removed by defendant (January 1, 1980), no arrangement was made with respect to compensation for their care and feed during the two and one-half months they had been in Baker's possession. The matter was discussed for the first time nearly a month later in a telephone conversation between Baker and defendant. The resulting agreement was simply that defendant pay Baker as soon as he had the money.

In mid-February, 1980, Summit County Sheriff Ronald Robinson received complaints that cattle (defendant's cattle) on the Baker Ranch were being starved. He, as well as his deputy, went to the Baker Ranch and examined the cattle. He testified that they were being neglected and needed immediate attention and care. Sheriff Robinson then called defendant at his home in Wyoming, reported the condition of his cattle and recommended that he come and pick them up.

Shortly thereafter, on or about February 16, 1980, defendant went back to Kamas to check on his cattle. He observed, just as had been reported, that some of his cattle had become weakened and emaciated. He asked, and in his words, "begged," Baker to let him take the cattle, but Baker, with the advice and consent of his partner, Novelle, refused to release any of the cows until defendant could pay the sum of $4,750, which he owed for the care and feeding of the cattle he had taken on January 1, 1980.

Defendant explained that he could not at that time pay the debt, but that it would be paid. His promise, however, did not affect the plaintiffs' decision to keep the cattle.

Defendant returned to Kamas some ten days later and observed that the herd was receiving more feed, but that many were still in a very weakened condition. He also found that his bull and 8 more of his cows were missing.

Again, on or about the 1st of March, 1980, defendant returned with his wife, Zona Hansen, to examine his herd. This time, they observed 5 cows lying in the pasture dead. They also testified that it did not appear as though the cows had been fed for quite some time.

A neighbor rancher, Dwayne Lambert, testified that Baker had not taken adequate care of defendant's cattle. He also testified that he helped Baker pull 13 to 15 dead cows out of the pasture.

Baker testified that during the spring of 1980, 65 of the surviving cows delivered calves, but 5 of the calves died during birth. He also testified that there were 42 cows which did not bear calves. These figures (65 and 42), however, suggest a total of 107 cows, which contradicts Baker's testimony that he was left with only 104 cows after defendant's removal of a portion of the herd in January, 1980.

Although under its terms the agreement between the parties terminated on October 16, 1980, Baker did not deliver the cows on that date, nor did defendant tender the money he owed for their care and feed.

On December 6, 1980, Baker released 64 cows to defendant. He retained 30 cows and 24 calves (representing defendant's 40 percent share of the spring, 1980, calf crop of 60) as security for the monies owing from defendant.

Accordingly, on December 6, 1980, plaintiffs could only account for 94 live cows of the 115 cows and 1 bull they had, or should have had, on January 1, 1980.[3] Of the 21

---

**3.** As pointed out *supra,* Baker claims to have actually had only 104 cows on January 1, 1980, although both defendant and Baker's son, who were present at the time defendant removed the cows, agreed that defendant had taken only

missing cows (115 less 94) and 1 bull, plaintiffs could only account for the loss of the bull and 9 of the cows, as follows: 2 cows died while delivering over-sized calves; 3 died from uterus protrusion; 1 died from C-section shock; 1 died from bloat; 1 died from old age; and 1 died as a result of falling between two cars being stored at the Baker Ranch. As to the bull, they merely claim that it died. Thus, while defendant's cattle were under Baker's care, 12 head died (2 yearlings, 9 cows and 1 bull) and 12 head were "lost," for a total of 24 head.

Plaintiffs' claim against defendant for $32,140, based on the agistor's lien, was calculated as follows: (1) $20 per month (two and one-half months) a head for the cattle defendant took in January, 1980 ($4,750);[4] (2) $30 per month (twelve months) a head for caring for the 42 barren cattle ($15,120); (3) $30 per month (one and three-fourths months) a head for the 64 cows taken by defendant on December 6, 1980 ($3,360); and (4) $30 per month (five and one-half months) a head for the 30 cows and 24 calves retained by plaintiffs ($8,910).

Plaintiffs' $20 and $30 figures are based upon the following factors: the cost of hay, the amount of hay required per head per day, the rental value of summer pasture in the Kamas area and the labor necessary to care for the cattle.

Plaintiffs testified that during the winter months (November, 1979, to May, 1980) they fed 20 pounds of hay per head daily. The cost of the hay was shown to have been $60 to $80 per ton. Based on these figures, plaintiffs calculated that the cost of feeding each animal per month was $24.

In addition to these feeding costs ($24), plaintiffs included in the $20 and $30 figures a labor charge for the care of the animals, based on four hours per day at $4 per hour.

During the grazing months, or those months when plaintiffs did not feed hay, they calculated the costs per head to be the same as during the winter months, inasmuch as the pasture rental for that area was between $18 and $20 per month per head, and their labor was still required for the care of the animals.

At issue in this case is the propriety of the trial court's award of damages. It is well established that:

> In fixing damages the trial court is vested with broad discretion and the award will not be set aside unless it is manifestly unjust or indicates that the trial court neglected pertinent elements, or was unduly influenced by prejudice or other extraneous circumstances.[5]

Defendant urges this Court to review both questions of law and fact in this case, inasmuch as the action is equitable in nature.[6] While we recognize that some courts have held the judicial enforcement of a statutory lien to be an action in equity, and that equity permits a much broader scope of review, we also acknowledge our time-honored rule, both in and out of equity, with respect to the findings and judgment of the trial court:

> While it is true that in equity cases this Court may review questions of both law and fact we are not bound to substitute our judgment for that of the trial court, and because of its advantaged position we give considerable deference to its findings and judgment.[7]

10 of the 125 mature cows, which therefore left Baker a total of 115.

4. For reasons not stated in the record, plaintiffs did not charge defendant for the care of the 5 fall calves returned on January 1, 1980. Thus, the $4,750 represented only the cost of feeding 85 yearlings and 10 cows during the stated period.

5. *Clayton v. Crossroads Equipment Co.,* Utah, 655 P.2d 1125 (1982).

6. *Perera Company, Inc. v. Goldstone,* 491 F.2d 386 (9th Cir.1974); *Washington Asphalt Company v. Boyd,* 63 Wash.2d 690, 388 P.2d 965 (1964).

7. *Ream v. Fitzen,* Utah, 581 P.2d 145, 147 (1978). *See also, e.g., Dang v. Cox Corp.,* Utah, 655 P.2d 658 (1982); *Parks Enterprises, Inc. v. New Century Realty, Inc.,* Utah, 652 P.2d 918 (1982).

Defendant's first contention on appeal is that the trial court's findings with respect to the reasonableness of plaintiffs' charges for feed and care are not supported by substantial evidence. This contention rests upon defendant's assertion that the only evidence offered by plaintiffs to support the reasonableness of their charges was the testimony of Baker himself, and that such self-serving evidence was not sufficient to establish reasonableness. The contention is also based upon the fact that the previous occupant of Baker's pasture was charged only $7 per head monthly, which fact, defendant alleges, evidences the unreasonableness of the $20 and $30 charges imposed upon him.

Our survey of the record reveals ample evidence to support the trial court's findings that the plaintiffs' charges were reasonable.

As heretofore indicated, plaintiffs calculated their costs on the basis of the amount of hay fed per animal, the cost of the hay, the rental value of the summer pasture and the labor performed in caring for the herd.

Contrary to defendant's assertion, Baker's testimony was not the sole source of plaintiffs' evidence regarding the charges for feed and care. The evidence that 20 pounds of hay had been fed per head daily was introduced through the testimony of both Baker and Novelle. Furthermore, the reasonableness of feeding this amount of hay was confirmed through the testimony of an experienced rancher, Dwayne Lambert (defendant's witness).

Likewise, with regard to the costs incurred by the plaintiffs for hay, the trial court heard the testimony of both Baker and Novelle. Baker testified that he had incurred a $6,000 expense, representing the value of 100 tons of hay purchased at $60 per ton, while Novelle testified that his expenses had been $15,428.05 for hay which had been priced at $80 per ton. Again, additional evidence was introduced to establish the reasonableness of such costs. Robert Beall, a rancher in the Kamas area, testified that hay was selling for $90 per ton at the time in question.

Plaintiffs' calculations with respect to the monthly rental value of summer pasture and the amount and value of the labor performed in caring for the cattle were introduced principally through the testimony of Baker. According to Baker, the average rental value for pasture in that area ranged between $18 and $20 per head monthly. He further determined that he had spent an average of four hours per day caring for the cattle, and that $4 per hour was a reasonable charge for his labor. Although no additional witnesses were called to verify these particular calculations, none were required. Baker was an experienced rancher and competent to testify. Furthermore, his testimony was uncontroverted. It was therefore reasonable and proper for the trial court to accept his testimony as to value.

In addition to the foregoing testimonial evidence, plaintiffs proffered written documentary evidence (exhibits) to establish the validity and reasonableness of their calculations and ultimate charges.

Aside from defendant's assertion that plaintiffs' charges were unreasonable because they were based solely upon Baker's testimony, the only basis for defendant's contention of unreasonableness is the fact that the previous occupant of Baker's pasture was charged a mere $7 per head monthly. Defendant maintains that this evidence clearly illustrates the unreasonableness of the $20- and $30-per-head charges imposed upon him.

Plaintiffs refuted the alleged fatal effect of this evidence by introducing additional evidence which revealed substantial differences between the previous $7-per-month rental agreement and the present $20- and $30-per-month agreement. The major differences were that the former agreement covered the summer months only, and the lessee had the responsibility for all labor and costs in connection with the livestock, whereas the present agreement extended throughout the entire year and placed full responsibility for the care and feeding of the livestock upon the lessor (plaintiffs).

On the basis of the foregoing evidence, the trial court's findings that plaintiffs' charges for feed and care are reasonable and that plaintiffs are therefore entitled to damages in the amount of $32,140 must be affirmed.

 Defendant further alleges that plaintiffs are precluded from recovering damages by reason of their failure to mitigate such damages.[8] He contends that plaintiffs could have reduced their damages by selling the cattle pursuant to the agistor's lien at the earliest possible date or by delivering to defendant all of the animals except the minimum necessary to cover the amount of the lien. Additionally, he contends that the damages could have been reduced had plaintiffs pregnancy tested the cows and released the barren cows to defendant or sold them pursuant to the lien.

U.C.A., 1953, § 38-2-1 provides:

Every ranchman, farmer, agistor, herder of cattle, tavern keeper or livery stable keeper to whom any domestic animals shall be entrusted for the purpose of feeding, herding or pasturing shall have a lien upon such animals for the amount that may be due him for such feeding, herding or pasturing, and is authorized to retain possession of such animals until such amount is paid. [Emphasis added.]

The underscored enforcement provision clearly justifies plaintiffs' retention of defendant's cattle beyond the termination date (October 16, 1980) of the agistment agreement. Furthermore, plaintiffs' right to reimbursement for feeding and caring for the animals after the agreement terminated finds justification in previous decisions of this, as well as other jurisdictions.[9]

Defendant's position with respect to plaintiffs' holding the cattle when they could have been released or sold is further unsupported by the evidence. The record shows that plaintiffs did attempt to mitigate their damages by releasing 98 head (10 mother cows, 83 yearlings and 5 fall calves) on January 1, 1980, and an additional 65 head (64 mother cows and 1 bull) on December 6, 1980. Plaintiffs finally retained only 30 cows and 24 calves, believing retention of these animals necessary to adequately protect their lien.

The record also shows that, pursuant to the agistment agreement, the duty to pregnancy test the mature cows was placed upon defendant, not plaintiffs, and that defendant failed to fulfill this obligation. It would therefore be unreasonable, and moreover unjust, to require plaintiffs to mitigate their damages by performing defendant's contractual obligation.

Defendant also contends that plaintiffs are his bailees, and are therefore liable to him for the value of the animals not accounted for. We agree with this contention.

 It is well established that a contract to care for animals for a specified term, an agistment, is a "species of *bailment*,"[10] and that under such a contract "there is ordinarily an obligation to *return* or *account* for the animals at the end of the term" (emphasis added).[11] Failure to so account may result in the imposition of liability upon the bailee.

In a recent and similar case involving an agistment of cattle, the Supreme Court of New Mexico addressed the issue of a bailee's liability for unreturned and unaccounted for cattle:

Under the law of bailment, if the property of the bailor (appellant) is returned damaged or cannot be returned at all, the bailor, in order to recover against bailee, must show that he first delivered the

---

8. In support of this position, defendant cites: *Casey v. Nelson Brothers Construction Co.,* 24 Utah 2d 14, 465 P.2d 173 (1970), and *Utah Farm Production Credit Ass'ns v. Cox,* Utah, 627 P.2d 62 (1981).

9. *See Hughes v. Yardley,* 19 Utah 2d 166, 428 P.2d 158 (1967); *Crouch v. Brookshire,* Mo.

App., 330 S.W.2d 592 (1959); 3A C.J.S. Animals § 56, at p. 529 (1973).

10. 3A C.J.S. Animals § 47, at p. 515 (1973). *See also New Mexico Feeding Co. v. Keck,* N.M., 95 N.M. 615, 624 P.2d 1012 (1981).

11. 3A C.J.S. Animals § 48, at p. 518 (1973).

property in good condition. If that showing is made then there arises a presumption that the bailee is negligent and it casts upon the bailee the burden of going forward with evidence to overcome the presumption.[12]

The record in the present matter shows that plaintiffs (bailees) were unable to return a total of 24 of the 216 head of cattle originally entrusted to their care under the agistment agreement. Twelve of the missing 24 head were reported as having died of various causes, while the remaining 12 were completely unaccounted for.

The record also shows that defendant's cattle were delivered to Baker's ranch in good condition. Only hours before their delivery, the cattle had been examined by Dr. Stanley Hull, who reported their condition to be "very good." Upon delivery, it was reported that their condition was still good, despite the long haul by truck from Idaho.

By reason of the foregoing evidence, a presumption of plaintiffs' negligence arose and the burden of going forward with evidence to overcome the presumption was cast upon plaintiffs.

 Plaintiffs failed to present any evidence as would account for the loss of 12 of the 24 missing head of cattle. The presumption of negligence for the loss of those 12 head therefore prevails. Accordingly, as negligent bailees, plaintiffs are liable to defendant for the reasonable value of those 12 head.[13]

With respect to the remaining 12 head of cattle that are missing, the record does contain evidence of an accounting by plaintiffs for their loss.[14] There are, however, no findings indicating whether the trial court considered this evidence sufficient to overcome the presumption of negligence. In fact, there are no findings at all regarding the issue of plaintiffs' negligence or their liability for the missing cattle.

We therefore remand this case to the trial court with instructions to make appropriate findings on: (1) the value of the 12 mature cows that were not accounted for, and (2) the sufficiency of plaintiffs' accounting as to the 12 head that died. Should the trial court find that plaintiffs' accounting as to any or all of the latter 12 head is insufficient to overcome the presumption of negligence, the value of such animal or animals shall be determined also. This value, together with the value determined for the 12 head unaccounted for, shall be applied as an offset against the $32,140 award to plaintiffs.

We have reviewed the other issues raised by defendant and deem them without merit. In all other respects, the judgment is affirmed. No costs awarded.

STEWART, OAKS, HOWE and DURHAM, JJ., concur.

---

**12.** 624 P.2d at 1017. *See also Maher v. Smith,* 94 Okl. 238, 221 P. 749 (1923).

**13.** As to the measure of damages awardable to defendant (bailor), *see* 3A C.J.S. Animals § 42, at p. 510 (1973).

**14.** Plaintiffs' evidence accounting for the loss of 12 head is set forth *supra.*