Alfred T. **SMURTHWAITE**, Plaintiff and Appellant,

v.

John **PAINTER**, Defendant and Respondent.

No. 880073–CA.

Court of Appeals of Utah.

June 10, 1988.

---

Peter C. Collins (argued), Winder & Haslam, Salt Lake City, for plaintiff and appellant.

Taylor D. Carr, Salt Lake City, for defendant and respondent.

Before DAVIDSON, JACKSON and GARFF, JJ.

## OPINION

DAVIDSON, Judge:

Plaintiff Alfred Smurthwaite appeals the district court's judgment in favor of defendant John Painter dismissing Smurthwaite's complaint for no cause of action. Plaintiff relies on two theories: breach of contract and breach of an agistment bailment agreement, both arising from the death of ten of Smurthwaite's broodmares. We affirm.

At all times material hereto, Painter owned, leased, or otherwise controlled 390 acres (hereinafter, "the subject land"), located in Davis County, Utah. The subject land is divided into one 40 acre parcel with approximately 10 acres of pasture referred to as the "upper pasture" and a second 350 acre pasture referred to as the "lower pasture." The two parcels are divided by a large drainage ditch, running roughly east and west. The lower pasture has good grass and water, but does not contain as much crested wheat grass which grows tall enough to provide pasturage during winter months. While Painter's home lies adjacent to the upper pasture, from his home or barn the lower pasture is not visible.

In the fall of 1981, Smurthwaite and Painter entered into an oral agreement, automatically renewable on a month-to-month basis, whereby Smurthwaite would pasture his Appaloosa horses on Painter's property for $15 per head per month. At the end of each month, until November 1983, Smurthwaite counted the number of horses on the pasture to determine the amount owed to Painter.[1]

Smurthwaite placed horses on the upper pasture in October 1981. According to the oral agreement, Painter had no responsibility to feed or check Smurthwaite's horses, nor to maintain any fences on the subject land.[2] Smurthwaite had free access to come and go onto the property and to move

1. Smurthwaite is an experienced horseman, having been involved in the Appaloosa breeding business since 1967–68. Smurthwaite is aware that a horse can starve to death in two-four weeks. Painter is not an experienced horseman.

2. Smurthwaite's reply brief concedes that Painter had no responsibility to feed nor inspect his horses. However, he does contend that Painter was not excused from all *care* of the horses. Smurthwaite expected Painter to exercise a modicum of sensory concern, and when reasonably necessary, to communicate his concerns to Smurthwaite.

his horses in and out as necessary without contact or interference from Painter. The lower pasture has three means of access: through Painter's farm, through sewer plant property, and through the south end of the 350 acre parcel by Miller's pond. The sewer plant access is paved and is plowed in the winter.[3]

During the fall and winter of 1981–82, Smurthwaite inspected his horses three to four times each week and twelve times during the 1982–83 winter season. During the spring of 1982, Smurthwaite's horses were moved to the lower pasture. There is dispute as to who moved the horses but Smurthwaite made no objection. The horses remained in the lower pasture from spring 1982 until June 1984.

In the fall of 1982, Painter entered into agreements with others resulting in sheep, horses, and a trailer being placed on the upper pasture. While Smurthwaite testified that he observed the sheep on the upper pasture, he never complained to Painter about the other livestock or his horses being on the lower pasture.

The winter of 1983–84 was very severe, the first snow falling in November. Smurthwaite inspected his horses on December 5, 1983, but did not inspect them again until February 4, 1984, and then only from the road. He testified he could not identify them as his horses because they were too far away. Three days later, on February 7, 1984, Smurthwaite walked onto the lower pasture and found that ten of his Appaloosa broodmares with unborn foals had died from starvation. All of the horses on the upper pasture survived the 1983–84 winter.

Smurthwaite filed his complaint October 4, 1984, and a bench trial was heard May 21, 1986. The trial court concluded: the agreement did not apply to any particular parcel of Painter's land; no agistment agreement had been made between the parties; Painter did not breach the agreement; and Painter did not owe any duty of care for the livestock nor to inspect the animals nor even to report their condition under the

circumstances of this case. The court concluded:

> [H]owever, assuming that such a duty existed and defendant were found to be negligent in carrying out that duty, the Court would conclude that plaintiff in failing to inspect his stock from December 5, 1983, to February 7, 1984, was negligent himself and that said negligence was at least equal to, if not greater, than that of defendant.

The trial court granted judgment to defendant and ordered plaintiff's complaint dismissed for no cause of action.

The dispositive issue on appeal is whether the trial court erred in failing to find an agistment bailment agreement. The Utah Supreme Court defined agistment bailment in *Baker v. Hansen,* 666 P.2d 315 (Utah 1983), stating:

> It is well established that a contract to care for animals for a specified term, an agistment, is a "species of *bailment,*" and that under such a contract "there is ordinarily an obligation to *return* or *account* for the animals at the end of the term."

*Id.* at 320 (footnote omitted) (emphasis in original). Likewise, the Montana Supreme Court in *Heckman and Shell v. Wilson,* 158 Mont. 47, 487 P.2d 1141, 1146 (1971), stated:

> The term agistment is characterized by an agreement in which one person agrees to care for and feed animals of another for a consideration, either at a named price or for the reasonable value of the services rendered.

*See also* 3A C.J.S. *Animals* § 46 (1973). These cases are in accord with the law of bailment which gives total control and exclusive possession of property to the bailee during the bailment period. 8 C.J.S. *Bailments* § 23 (1988).

The record indicates that Smurthwaite had total control over his horses in moving them in and out of the subject land. Smurthwaite was responsible for the monthly accounting of horses to determine

---

**3.** The trial court found that Smurthwaite had used the sewer plant access at least 6 times prior to the 1983–84 winter to move horses in and out.

the rents due. Further, Smurthwaite testified that he did not expect Painter to feed or care for his horses. During the more than two years prior to December 1983, Smurthwaite inspected, fed, and tended his horses at least two to three times a week while Painter had nothing to do with them. There is no showing that Painter had any duty to look after or care for the animals of Smurthwaite.

 We decline to take the position urged upon us by Smurthwaite that any agreement for the use of pasture carries with it a duty of care on the part of the landowner. To do so would create a new species of bailment that was never intended or contemplated by the parties. For an agistment bailment to be established, there must be a showing of some duty of care bargained for and accepted by the landowner. There is no such showing in this case.

The judgment of the district court is affirmed. Costs are awarded to respondent.

JACKSON and GARFF, JJ., concur.