**Orson CORNIA, Morrell Weston and Sons Ranching Company, Inc., a Utah corporation, and Dennis Weston, Plaintiffs, Appellees, and Cross–Appellants,**

v.

**James D. WILCOX, Defendant, Appellant, and Cross–Appellee.**

No. 930608.

Supreme Court of Utah.

June 28, 1995.

Robert A. Echard, Ogden, for plaintiffs.

Jeremy Hoffman, Salt Lake City, for defendant.

HOWE, Justice:

Plaintiff cattle owners brought this action for the loss of and damage to their cattle that grazed on defendant's property. A jury returned a verdict in favor of plaintiffs, awarding $110,019.96 in damages. Defendant appeals. Plaintiffs cross-appeal the trial court's refusal to award prejudgment interest.

## I. FACTS

We recite the facts in a light favorable to the jury verdict. *State v. Johnson,* 774 P.2d 1141, 1147 (Utah 1989); *Andreason v. Aetna Casualty & Sur. Co.,* 848 P.2d 171, 173 (Utah Ct.App.1993). In late 1988, plaintiffs Orson Cornia and Dennis Weston entered into separate pasture agreements with defendant James Wilcox for the "total care" of approximately 500 head of cattle for one year. According to the agreements, "Total care includes ... salt, water, range feed, and trailing of the cattle. It does not include vaccines, medicine, or trucking." The parties agreed that plaintiffs would have the right to enter Wilcox's property for these latter purposes and to assist in branding the cattle. Wilcox gave plaintiffs keys to the gates of his property but requested that they call and let him know when they were coming. The parties also agreed that Wilcox would not be liable for the death of any cattle, but there was no agreement as to cattle not otherwise returned at the end of the year.

The rangeland consisted of both private and public land which Wilcox owned, leased, or was otherwise entitled to graze cattle upon. Wilcox informed plaintiffs that some of the property was fenced and that natural barriers would restrict movement of the cattle where there were no fences. He also stated that he had a fencing crew that kept the fences in good condition. He assured plaintiffs not to worry about the cattle and that when it was time to pick them up, they would be in his corral ready to take home.

In November 1988, plaintiffs delivered 478 cows to Wilcox. Except for 1 cow that died upon arrival, they were in good condition, and all but 40 had tested pregnant.[1] Wilcox testified that he took care of plaintiffs' cattle as if they were his own. At the end of the winter, Wilcox and his employees moved the cattle to the summer range. He testified that 16 cows died during the winter but that all of the other cattle had been accounted for and were in good condition. Wilcox's employee testified that the grass and water on the summer range were good, that he had no problems with the cattle, and that he kept track of them. In May 1989, Wilcox billed plaintiffs for 480 pairs of cattle (cow and calf) with the understanding that the final accounting would occur when the cattle were returned.

Plaintiffs and their representatives came onto the range several times to brand, vaccinate, and move the cattle as agreed by the parties. On a number of occasions, plaintiffs expressed concern that many of the cows and calves appeared to be missing, but each time, Wilcox assured them that the cattle were all there and there was no need to worry.

In November 1989, following expiration of the pasture agreements, the cattle were rounded up, placed into a corral, and loaded into plaintiffs' trucks. Many of the cattle were missing. Both parties and local law enforcement officials conducted additional searches and successfully located more of them. However, according to the final count, 107 of the cows and 177 of the expected calves were not returned.[2] The animals that were returned were allegedly in poor condition.

Plaintiffs brought suit against Wilcox, alleging breach of the written pasture agreements and breach of common law agistment. Following a four-day trial, the jury returned a verdict in favor of Wilcox on the breach of the pasture agreements but against him on the agistment claims. More specifically, the jury unanimously found that the parties had formed "a contract of agistment" and, by a vote of 6–2, found that Wilcox had breached that contract. The jury awarded damages for 90 cows at $715 each and 113 calves at roughly $400 each, or $39,286.20 for Cornia

---

1. Cornia delivered 186 cows, all of which had tested pregnant, and Weston delivered 292 cows, 252 of which had tested pregnant. Plaintiffs also delivered 25 bulls to Wilcox, but all of these were eventually returned. Thus, the bulls are not part of this action.

2. Thirty-seven of Cornia's cows and 70 of Weston's cows were not returned. Sixty-nine of Cornia's anticipated calves and 108 of Weston's anticipated calves were also missing.

and $70,733.76 for Weston. No damages were awarded for the alleged poor condition of the cattle that were returned. The trial court, in a subsequent ruling, denied plaintiffs' request for prejudgment interest.

Wilcox appeals, contending that (1) the trial court erred by denying his motion for directed verdict and motion for judgment notwithstanding the verdict ("judgment n.o.v.") on the agistment claims, (2) the trial court erred by refusing to give a requested jury instruction, and (3) the evidence does not support the amount of the jury's award. Plaintiffs cross-appeal the trial court's refusal to award prejudgment interest.

## II. ANALYSIS

■ We begin with a brief review of bailment and agistment law. Under traditional bailment law,

where goods bailed for a fee are damaged or destroyed[,] a presumption of negligence is imposed on the bailee once the bailor proves the fact of bailment and damage to the bailed goods. The bailee must then come forward with evidence that the loss or damage was not due to the bailee's negligence.

*Staheli v. Farmers' Coop. of S. Utah*, 655 P.2d 680, 682 (Utah 1982) (citing, among others, *Romney v. Covey Garage*, 100 Utah 167, 170–71, 111 P.2d 545, 545–46 (1941)); *see also McPherson v. Belnap*, 830 P.2d 302, 306 (Utah Ct.App.1992). The rationale for this presumption is that the bailee, as the party in possession of the bailed property, " 'is in a better position to control the conditions that may cause loss or damage and to know, or at least to be able to ascertain, the cause of any actual loss or damage.' " *McPherson*, 830 P.2d at 306 (quoting *Staheli*, 655 P.2d at 683); *accord Sumsion v. Streator–Smith, Inc.*, 103 Utah 44, 60, 132 P.2d 680, 687 (1943).

■ An agistment contract is a species of bailment whereby one agrees to keep and care for another's animals. *Baker v. Hansen*, 666 P.2d 315, 320 (Utah 1983); *Smurth-*

*waite v. Painter*, 755 P.2d 753, 755 (Utah Ct.App.1988); 3A C.J.S. *Animals* §§ 46–47 (1973). To establish an agistment contract, the bailor must show that (1) some duty of care was bargained for and accepted by the landowner, and (2) the animals were delivered in good condition. *See Baker*, 666 P.2d at 320–21 (holding agistor liable for missing cows); *Smurthwaite*, 755 P.2d at 756 (finding no agistment contract because landowner did not have duty to care for horses grazed on his property). Upon this showing, if the animals are lost or damaged while in the exclusive possession and control of the agistor, a presumption arises that the agistor is negligent and he then carries the burden of going forward with evidence to overcome the presumption. *See Baker*, 666 P.2d at 320–21; *cf. Staheli*, 655 P.2d at 683; *McPherson*, 830 P.2d at 306.

### A. Motions for Directed Verdict and Judgment N.O.V.

■ "A directed verdict and a judgment n.o.v. are justified only if, after looking at the evidence and all reasonable inferences in a light most favorable to the nonmoving party, 'the trial court concludes that there is no competent evidence which would support a verdict in his favor.' " *DeBry v. Cascade Enters.*, 879 P.2d 1353, 1359 (Utah 1994) (quoting *Gustaveson v. Gregg*, 655 P.2d 693, 695 (Utah 1982)). If reasonable persons could reach differing conclusions on the issue in controversy, then the motion should be denied. *Id.; Management Comm. of Graystone Pines Homeowners Ass'n v. Graystone Pines, Inc.*, 652 P.2d 896, 897–98 (Utah 1982). Thus, a motion for a directed verdict or judgment n.o.v. can be granted only when the moving party is entitled to judgment as a matter of law. *Hansen v. Stewart*, 761 P.2d 14, 17 (Utah 1988). In reviewing the trial court's denial of a directed verdict and a judgment n.o.v., this court applies the same standard.

■ Wilcox asserts that the trial court erred in not granting his motion for a directed verdict and a judgment n.o.v. because

reasonable minds could not conclude that Wilcox ever had "exclusive possession and control" of the cattle. Plaintiffs' cattle were grazed for an extended period of time on public land to which the general public had access. Plaintiffs also had a key to access Wilcox's range and did so a number of times for various purposes. Thus, Wilcox contends, he did not have the legal right to exclude either members of the public from the public lands or plaintiffs from the entire rangeland. He argues that because plaintiffs failed to prove his exclusive possession and control of the cattle, they were not entitled to the presumption of his negligence under an agistment theory. Lacking any direct evidence of his negligence, Wilcox concludes that the jury's verdict is not supported by any competent evidence. We disagree.

The court of appeals has held that "exclusive possession and control"

> does not mean that ... the bailee must be the only one who has access to the property. *The bailee may allow others to access the property without destroying the bailment.* The requirement is only that the bailee have the right to exclude all persons *not covered by the agreement* and to control the property.

*McPherson,* 830 P.2d at 305 (emphasis added); *see also* 8 Am.Jur.2d *Bailments* § 78 (1980) (explaining that bailee is ordinarily entitled to exclude others "within the terms of the bailment"). In *McPherson,* a landlord assured his vacating tenants that their furniture would be safe if they left it in his condominium. 830 P.2d at 303. The landlord's son moved into the unit. The furniture was subsequently stolen, and the landlord denied any liability, claiming that he did not have exclusive possession and control of the furniture. The court applied the negligence presumption against the landlord and held him liable under a bailment theory because access by the third party had been contemplated in the bailment agreement. *Id.* at 305.

This case is like *McPherson* because in both instances, the parties to the bailment envisioned that others would have access to the bailed property. Here, both plaintiffs and Wilcox were ranchers and knew that when the cattle were on public land, third persons would have access to them. The parties also agreed that plaintiffs, as owners of the cattle, should have limited access to them for a few narrow purposes such as administering vaccines and medicine. This access, fully contemplated by the parties when the agistment contract was formed, should not destroy the presumption of the agistor's negligence when it was discovered that the property was missing.

This case is very different from *Staheli,* where stored grain was destroyed by a fire of unknown origin. 655 P.2d at 681. This court refused to give the bailor the benefit of a presumption of negligence on the part of the bailee because (1) the bailor had unlimited access to the warehouse where the grain was stored, (2) there was evidence of the bailor's negligence, (3) the bailee was not primarily responsible for controlling the conditions that led to the fire, and (4) the lack of control and precautions arose through an emergency situation to find storage for the grain. *Id.* at 684. We concluded:

> [A] presumption of negligence did not arise because of the absence of the [bailee's] exclusive control of the premises. Under the circumstances, *the [bailee] was in no better position than the [bailor]* to know, or to be able to ascertain, the cause of the fire or to control several of the possible causes of the fire.

*Id.* at 683–84 (emphasis added).

None of the facts that led to the decision in *Staheli* is present here. It is clear that Wilcox, as caretaker and tracker of the cattle, was always in a far better position than were plaintiffs to prevent, know, or ascertain the cause of the loss. The parties contemplated that Wilcox would graze the cattle on both private and public property, trail them, and provide for their care. Wilcox testified that he and his men rode through the range nearly every day and kept the fences well maintained. If members of the general pub-

lic had contact with the cattle on the open range, Wilcox, not plaintiffs, would be in the best position to know of that fact. Plaintiffs lived hundreds of miles away, and their contact with the cattle was infrequent, was limited to a few narrow purposes, and was made only by first advising Wilcox of their arrival. Under these circumstances, it was not unjust to impose a presumption of negligence on Wilcox. To hold otherwise would apply the exclusive possession and control requirement in a mechanical and wholly unrealistic fashion.

■ We decline to strictly apply standard bailment principles because this case differs from most bailment cases in two important ways. First, the bailed property consisted of cattle, which were alive and mobile. Typically, the bailed property is inanimate and is stored under lock and key in a confined area. Second, the agistment took place on public land. When this is the case, exclusive possession and control does not require that the agistor have the legal right to exclude others from the property whereon the cattle graze. Otherwise *no* cattle owner would be entitled to the presumption of negligence where the agistment arrangement anticipated grazing cattle on public rangeland. Because the cattle owner is generally not in as good a position as the agistor to explain the loss, the owner, without the presumption of negligence, would likely fail to state a prima facie case of negligence. Thus, the practical effect of strictly applying the exclusive possession and control requirement would be to relieve all liability on the part of an agistor for loss or damage when cattle, while in his care, are grazing on public rangeland. The impact upon agistment arrangements would be significant in a state like Utah where a large percentage of the rangelands are public.

This case is similar to *Henry McCleary Timber Co. v. Sewell*, 72 Nev. 231, 301 P.2d 1047 (1956), where a cattle owner sought recovery for the loss of some of its cattle.

The agistment agreement provided that the agistors would care for the owner's cattle during a two-year period. The parties agreed that the cattle would graze on the agistors' range, which consisted of private properties and range rights in five townships. The cattle were delivered to the agistors and commingled with their cattle on the agistors' range. Several months later, the cattle were moved to a new range, and a count revealed 298 head less than had been delivered. The court stated that upon a showing by the owner of proof of loss, the presumption of negligence operated and placed the burden of going forward on the agistors. *Id.* 301 P.2d at 1049.

At trial, the agistors in *Sewell* met their burden and proffered sufficient evidence to convince the trier of fact that they had not been negligent in caring for the cattle but at all times had maintained good range practices. *Id.* The agistors also proffered evidence to show that the loss resulted from the drifting of the cattle to their home range and the poor condition of the cattle when delivered to the range. *Id.* The owner then failed to offer sufficient evidence to fix liability upon the agistors. The trial court concluded that the agistors were not liable for the loss. The *Sewell* court affirmed, stating that the trial court's conclusions were adequately supported by the record. *Id.*

Likewise, in this case plaintiffs are entitled to the presumption of negligence because Wilcox was the one entrusted with the care of the cattle and was in a better position than plaintiffs to control the conditions of loss or damage. Thus, the burden is upon Wilcox to proffer sufficient evidence to show an absence of negligence on his part or to show the circumstances surrounding the loss and why it was not due to his negligence. The jury heard Wilcox's evidence as to the care he gave the cattle but was unconvinced that it rebutted his presumed negligence. We find sufficient competent evidence to support the verdict.

**1386**

### B. Bailment Jury Instruction

 "A trial court has a duty to instruct the jury on the law applicable to the facts of the case." *State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992) (citing *State v. Potter*, 627 P.2d 75, 78 (Utah 1981)). Determining whether the trial court's refusal to give a proposed jury instruction constitutes error presents a question of law. Therefore, we grant no particular deference to the trial court's rulings. *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 452 (Utah 1993); *Hamilton*, 827 P.2d at 238; *Ramon v. Farr*, 770 P.2d 131, 133 (Utah 1989).

 Wilcox contends that the trial court committed prejudicial error in refusing to instruct the jury that the exclusive possession and control standard requires proof of the bailor's legal right to exclude the owner and all others from possession. Wilcox's argument hinges on language in *McPherson:* "The bailor must actually or constructively deliver the property to the bailee in such a way as to entitle the bailee to exclude others from possession during the bailment period, including the owner/bailor." 830 P.2d at 304 (citing *Broaddus v. Commercial Nat'l Bank*, 113 Okla. 10, 11, 237 P. 583, 584 (1925)). While we have no quarrel with this requirement in traditional bailment cases, as we have explained, exclusive control was not contemplated by the parties to this action. Accordingly, we hold that the court correctly refused to so instruct the jury.

### C. Award of Damages

 Wilcox contends that there is insufficient competent evidence to sustain the jury's findings as to the value of the missing mature cattle for which damages were awarded. " '[J]uries are generally allowed wide discretion in the assessment of damages.' " *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1084 (Utah 1985) (quoting *Cruz v. Montoya*, 660 P.2d 723, 726 (Utah 1983)). We view the evidence in a light most favorable to the jury's findings and will uphold its calculation of damages so long as there is competent evidence to sustain it. *Rees v. Intermountain Health Care, Inc.*, 808 P.2d 1069, 1072 (Utah 1991); *Penrod v. Carter*, 737 P.2d 199, 200 (Utah 1987).

 The jury awarded damages for 90 cows, and did so at the rate of $715 each. Plaintiffs' expert testified that in the fall of 1989, the average market price for a pregnant mature cow was $715 and the average price for a nonpregnant cow was $492. Wilcox argues that the jury could not conclude that every missing cow should have been returned pregnant and that a fifty percent pregnancy rate was the only rate supported by the evidence. We agree.

Plaintiffs' own expert testified that he based his damage calculations on the assumption that all of the mature cows would have returned pregnant. On cross-examination, he admitted that an unknown number of nonpregnant cows must be expected and a corresponding deduction in value per head would "seem obvious." When plaintiffs tested the cattle that were returned by Wilcox, approximately half of them were pregnant. Wilcox's expert testified that a fifty percent pregnancy rate was not abnormal given the fact that the cattle were on Wilcox's range for the first time and there was a severe drought in the area. An experienced rancher testified that a fifty percent pregnancy rate would not be unusual, while a neighboring rancher testified that the rate was consistent with the rates experienced by ranchers on nearby range during the same period and under similar circumstances.

We conclude that the jury's calculation of damages in regard to the missing mature cows is not supported by competent evidence. We therefore hold that Wilcox is entitled to a remittitur to reflect half of the missing mature cattle at $492 per head instead of $715. *See Nelson v. Jacobsen*, 669 P.2d 1207, 1217 (Utah 1983) (explaining that court may require remittitur to restrain or reduce arbitrary or excessive jury verdict). This de-

creases Cornia's award by $3,345 (15 head at $223) to $35,941.20 and Weston's award by $6,690 (30 head at $223) to $64,043.76.

### D. Prejudgment Interest

In their cross-appeal, plaintiffs assert that the trial court erred in not awarding them prejudgment interest on the jury's damages award. A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness. *Bailey–Allen Co. v. Kurzet,* 876 P.2d 421, 427 (Utah Ct.App.1994); *Andreason v. Aetna Casualty & Sur. Co.,* 848 P.2d 171, 177 (Utah Ct.App.1993). The law on this issue is clear:

> "[W]here the damage is complete and the amount of the loss is fixed as of a particular time, and that loss can be measured by facts and figures, interest should be allowed from that time ... and not from the date of judgment. On the other hand, where damages are incomplete or cannot be calculated with mathematical accuracy, such as in the case of personal injury, wrongful death, defamation of character, false imprisonment, etc., the amount of the damages must be ascertained and assessed by the trier of the fact at the trial, and in such cases prejudgment interest is not allowed."

*Canyon Country Store v. Bracey,* 781 P.2d 414, 422 (Utah 1989) (alterations in original) (quoting *First Sec. Bank of Utah v. J.B.J. Feedyards, Inc.,* 653 P.2d 591, 600 (Utah 1982)); *see also Bellon v. Malnar,* 808 P.2d 1089, 1097 (Utah 1991).

Plaintiffs rely on *Jorgensen v. John Clay & Co.,* 660 P.2d 229 (Utah 1983), where a seller of sheep brought a breach of contract action against a buyer. Following the buyer's repudiation of the contract, the seller sold the sheep to another buyer at an amount less than the defendant buyer was contractually obligated to pay. *Id.* at 230. The jury awarded the seller damages based upon the difference between what the seller should have received under the contract and what he actually received. *Id.* at 233. The trial court added prejudgment interest to the award, and this court affirmed that decision. *Id.* at 230.

*Jorgensen* is clearly distinguishable from this case. In *Jorgensen,* there was no dispute as to the number or the price of the sheep that were to be sold. In this case, the jury heard conflicting testimony from experts regarding the cattle's expected pregnancy rates, weight range, loss rates, and market prices. In addition, the jury heard divergent evidence regarding the calves' expected gender, weight range, mortality rates, and market prices. Plaintiffs could not establish these elements as a matter of fact, and thus the jury was free to use its best judgment in ascertaining and assessing the damages.

Plaintiffs' expert did estimate the value of the missing cows in his damage calculation. However, "[w]hile the expert's estimates were a reliable enough basis for awarding damages, the assumptions used to arrive at those estimates are by no means the only way to arrive at [the] damages." *Anesthesiologists Assocs. v. St. Benedict's Hosp.,* 852 P.2d 1030, 1042 (Utah Ct.App.1993), *vacated on other grounds,* 884 P.2d 1236 (Utah 1994). Without any clear factual information, plaintiffs' damages could not be measured by "facts and figures" or "calculated with mathematical accuracy." *See Canyon Country Store,* 781 P.2d at 422. Under these circumstances, the trial court correctly denied plaintiffs prejudgment interest.

For the above reasons, we grant a remittitur, decreasing the judgment to $35,941.20 for Cornia and $64,043.76 for Weston.

ZIMMERMAN, C.J., and STEWART, Associate C.J., concur.

DURHAM, Justice, dissenting:

I respectfully dissent. As the majority notes, its opinion "decline[s] to strictly apply standard bailment principles" and in effect creates a new rule for livestock grazed on

public rangeland. While it may reflect a legitimate policy choice, it is indeed a significant departure from existing law, a result not fully acknowledged in the opinion.

Wilcox contends that there was insufficient evidence to support a jury verdict that he had the legal right to exclude plaintiffs from possession of their cattle. He directs our attention to the undisputed evidence that the cattle were grazed for an extensive length of time on public land to which the general public had access. The record shows that throughout the duration of the pasture agreements, plaintiffs' cattle were spread in groups over both private and public land. This undisputed evidence should compel a finding that, as a matter of law, defendant did not have the legal right to exclude plaintiffs from their cattle. Thus, under Utah agistment law, reasonable minds could not have concluded that defendant had exclusive possession and control of the cattle.

This case is similar to *CFC Fabrication, Inc. v. Dunn Constr. Co.*, 917 F.2d 1385 (5th Cir.1990), which reversed a denial of a directed verdict on the issue of exclusive possession and control. The *CFC* court held that if a bailor and a bailee have simultaneous access to the bailed property when the loss or damage occurs, the law does not presume the bailee negligent. *Id.* at 1389. In drawing this conclusion, *CFC* discussed the rationale in *Staheli v. Farmers' Coop. of S. Utah*, 655 P.2d 680, 683 (Utah 1982), that a bailee who exclusively possesses bailed property is in a better position to control or ascertain the cause of any loss or damage. *CFC*, 917 F.2d at 1388. "In contrast, when the bailee does not solely possess the property, he is no more able to prevent or explain the loss than others simultaneously in possession and thus should not be required to explain the loss under pain of liability." *Id.* (citing *United States v. Mowbray's Floating Equip. Exch., Inc.*, 601 F.2d 645, 647 (2d Cir.1979)).

Similarly, if the parties possess the property consecutively and it is unknown whether the loss and damage occurred when the bailee was in possession, the law does not presume the bailee negligent. *Id.* Under the reasoning of the *CFC* court, throughout the duration of the pasture agreements, plaintiffs' cattle were grazed on both private and public rangeland. Because plaintiffs failed to show that their cattle were on defendant's private land at the time of their loss, i.e., that defendant had a legal right to preclude them from access to their cattle, I would find, as a matter of law, that a presumption of defendant's negligence should not arise. Indeed, it is arguably unjust in such a situation, with no showing of negligence, to require the bailee to account for the loss.

As defendant points out, grazing cattle are susceptible to loss and damage from many causes which the agister would not be able to ascertain. For example, grazing cattle can die, wander off, or be stolen without the agister's knowledge, even if the agister is providing due care. The presumption of negligence is, of course, not a perfectly functioning principle but arises from necessity, due to the fact that an agister who is in exclusive possession is in a better position than the bailee to ascertain the cause of loss or damage to the property. However, it does not appear in this case that reasonable minds could find that defendant alone had access to information about the loss and damage or that defendant alone was able to prevent the loss and damage. Accordingly, I would find the uncontroverted evidence establishes, as a matter of law, that defendant did not have exclusive access to and control of the cattle.[1] Therefore, the trial court

---

1. In marshaling the evidence, both parties point out that, pursuant to the written pasture agreements, defendant agreed to provide "total care" of plaintiffs' cattle. Although plaintiffs agreed to share responsibility for branding, vaccinating, and trucking, all other responsibilities in relationship to the cattle were assumed by defendant. This is only marginally relevant. Although the party who agrees to provide total care for property is most likely to be the party who has access to the property, the responsibility for total care does not establish the existence or absence of exclusive possession and control.

should have granted defendant's motion for a directed verdict. Plaintiffs' evidence failed to create a presumption of negligence, and as plaintiffs concede, they put forth no evidence of negligence.[2]

RUSSON, J., concurs in the dissenting opinion of Justice DURHAM.

2. This conclusion makes it unnecessary to treat defendant's challenge to the court's instruction setting out the requirement for a presumption of bailee's negligence under a bailment contract. In addition, due to this conclusion, there is no need to address the issues of damages and interest raised in the cross-appeal.